See also 305 F.2d 341.

James H. MEREDITH, on behalf of himself and others similarly situated, Appellant,

v.

Charles Dickson FAIR, President of the Board of Trustees of the State Institutions of Higher Learning, et al., Appellees.

No. 19475.

United States Court of Appeals
Fifth Circuit.
June 25, 1962.

Certiorari Denied Oct. 8, 1962.

See 83 S.Ct. 49.

C. B. Motley, New York City, R. Jess Brown, Vicksburg, Miss., Jack Greenberg, Derrick A. Bell, Jr., New York City, for appellant.

Chas. Clark, Jackson, Miss., Dugas Shands, Asst. Atty. Gen., Joe T. Patterson, Atty. Gen., Edward L. Cates, Asst. Atty. Gen., Jackson, Miss., for appellees.

Before BROWN and WISDOM, Circuit Judges, and DeVANE, District Judge.

WISDOM, Circuit Judge.

The Meredith matter is before us again. This time the appeal is from a final judgment after a trial on the merits. The judgment denies James A. Meredith, a Mississippi negro in search of an education, an injunction to secure his admission to the University of Mississippi. We reverse with directions that the injunction be issued.

A full review of the record leads the Court inescapably to the conclusion that from the moment the defendants discovered Meredith was a Negro they engaged in a carefully calculated campaign of delay, harassment, and masterly inactivity. It was a defense designed to discourage and to defeat by evasive tactics which would have been a credit to Quintus Fabius Maximus.

After the trial on the merits, the district judge found "as a fact, that the University is not a racially segregated institution". He found that the state has no policy of segregation. He did find that segregation was the custom *before* Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 was decided in May 1954. But, he held, "there is no custom or policy now, nor was there any at the time of the plaintiff's application, which excluded Negroes from entering the University." This about-face in policy, news of which may startle some people in Mississippi, could have been accomplished only by telepathic communication among the University's administrators, the Board of Trustees of State Institutions of Higher Learning. As the trial judge pointed out in his opinion, "nearly every member of the Board of Trustees, testified unequivocally and definitely that at no time had the question of race of a party ever been discussed at a meeting of the Board of Trustees or at any other place and that so far as the Board of Trustees was concerned, all policies and regulations were adopted and followed without regard to race, creed or color."

In our previous opinion in this case, 5 Cir., 298 F.2d 696, on the appeal from a denial of the preliminary injunction, D.C., 199 F.Supp. 754, it seemed to us that "what everybody knows the court

must know." [1] We took "judicial notice that the state of Mississippi maintains a policy of segregation in its schools and colleges." [2] (We find nothing now in this case reaching the dignity of proof to make us think we were wrong to take judicial notice of Mississippi's policy of segregation.) Nevertheless, on that appeal, giving the University the benefit of the doubt, it seemed to us that a trial on the merits would be in the interest of justice: for reasons not attributable to the endeavors or competency of counsel, it was impossible to determine from the record whether there were valid, non-discriminatory grounds for the University's refusing Meredith's admission. [3]

The district judge found no reason in the trial on the merits to change his earlier findings of fact and conclusions of law. He held that the evidence "shows clearly that there was no denial of admission because of his race and color." In reaching this conclusion the trial judge adopted the findings of fact in his earlier opinion on the motion for a preliminary injunction. It is necessary therefore to review the case from the beginning. Such whole-case review has the advantage of enabling the Court to consider the various contentions in context and to determine whether the pieces fit together to make a pattern of unlawful discrimination.

## I.

James H. Meredith was born in 1933 near Koscuisko, in Attala County, one of the rural counties in Mississippi. After graduating from high school in 1950 he volunteered for service in the United States Air Forces. When his hitch was over he reenlisted. In the Air Forces he rose to the rank of staff sergeant. He was discharged in the summer of 1960. He was never in trouble with civilian or military authorities. Meredith received an honorable discharge and the Good Conduct Medal.

Meredith got his education the hard way. Some time in 1953 he decided to improve himself. He turned first to "Fundamentals of Speech" and "Composition and Literature", extension courses of the University of Kansas. In 1954 he enrolled in a course in "Government of the United States" at Washburn University in Topeka. He received the grade of "C" in each of these subjects. From 1954 to 1960 he took advantage of college level courses of the United States Armed Forces Institute, for which Jackson State College credited him with 57 quarter hours credit. [4] Meredith's most fruitful years, educationally, were the two years

---

1. Justice Harlan in Jacobson v. Massachusetts, 1905, 197 U.S. 11, 30, 25 S.Ct. 358, 49 L.Ed. 643.

2. In our previous opinion, on the appeal from a judgment denying a preliminary injunction, we said:

   "This case was tried below and argued here in the eerie atmosphere of never-never land. Counsel for appellees argue that there is no state policy of maintaining segregated institutions of higher learning and that the court can take no judicial notice of this plain fact known to everyone. The appellees' chief counsel insists, for example, that appellant's counsel should have examined the genealogical records of all the students and alumni of the University and should have offered these records in evidence in order to prove the University's alleged policy of restricting admissions to white students. ¶ We take judicial notice that the state of Mississippi maintains a policy

of segregation in its schools and colleges. Cf. United States ex rel. Goldsby v. Harpole, 5 Cir., 1959, 263 F.2d 71, cert. denied, 361 U.S. 838, [850] 80 S.Ct. 58, [109] 4 L.Ed.2d 78 [89]."

   See also footnote 7.

3. We observed:

   "[T]he transcript and the deposition taken in the presence of the trial judge show that the counsel for the defendants was allowed so much latitude while at the same time the counsel for the plaintiff was so severely circumscribed in the examination of witnesses, introduction of evidence, and argument that the record contains a welter of irrelevancies and, at the same time, a conspicuous omission of evidence that should be helpful to a proper determination of the case."

4. Jackson State uses the quarter hour system for credits. Three quarter hours are roughly equivalent to two semester hours.

he spent in Japan just before leaving the service. He attended the Far East Division of the University of Maryland. He tackled difficult courses, such as "Russian", and he carried a heavy schedule. In 1958–1959 he had 5 "B's"; in 1959–1960 he had 3 "B's", 3 "A's", and 1 "F". The University of Maryland credited him with thirty-four semester hours for twelve courses.

Promptly after returning home, Meredith registered at Jackson State College, a "Negro" college in Hinds County, Mississippi. He moved to Jackson with his wife and child. At Jackson State his grades were almost all "A's" and "B's". In January 1961 he applied for admission to the University of Mississippi. When asked on the witness stand why he wished to transfer, he said Jackson State was "substandard".

These facts raise a doubt as to the defendants' good faith in asserting that Meredith was not in good faith in applying for admission to the University of Mississippi. That Meredith's transfer would mean the loss of credits and possibly the loss of some G.I. benefits, that he was in his late twenties, that he might find the University of Mississippi considerably more difficult than Jackson State College, demonstrate his persever-ance and fit in with the character of a man who is having a hard time getting a college education but is willing to pay the price exacted of a Negro for admission to the University of Mississippi.

## II.

The defendants' Fabian policy of planned discouragement and discrimination by delay is evident from the correspondence between Meredith and the University.

Some time in January 1961 Meredith wrote the Registrar for application forms. He received a prompt reply thanking him for his interest and enclosing the forms. January 31 he wrote the Registrar, enclosing the executed forms. In this letter Meredith expressly informed the University that he was a Negro. This was not a gesture of defiance—the forms require a photograph and an indication of race—but a predicate for pointing out that although he could not furnish the names of alumni who resided in his county and had known him for at least two years, he was submitting certificates regarding his moral character from Negro citizens who had known him in the county of his birthplace. As is apparent from the letter,[5] Meredith was "hopeful that the complications [would]

5. The letter reads:
"Dear Mr. Robert B. Ellis:
I am very pleased with your letter that accompanied the application forms you recently sent to me. I sincerely hope that your attitude toward me as a potential member of your student body reflects the attitude of the school, and that it will not change upon learning that I am not a White applicant.
I am an American-Mississippi-Negro citizen. With all of the occurring events regarding changes in our old educational system taking place in our country in this new age, I feel certain that this application does not come as a surprise to you. I certainly hope that this matter will be handled in a manner that will be complimentary to the University and to the State of Mississippi. Of course, I am the one that will, no doubt, suffer the greatest consequences of this event, therefore, I am very hopeful that the complications will be as few as possible.

I will not be able to furnish you with the names of six University Alumni because I am a Negro and all graduates of the school are White. Further, I do not know any graduate personally. However, as a substitute for this requirement, I am submitting certificates regarding my moral character from Negro citizens of my State.
Except for the requirement mentioned above, my application is complete. All colleges previously attended have been contacted and my transcripts should already be in your office or on the way. I am requesting that immediate action be taken on my application and that I be notified of its status, as registration begins on February 6th, 1961, and I am hoping to enroll at this time.
Thank you very much.
Very hopefully yours,
/s/ J H Meredith
_____
J H MEREDITH
Applicant"

be as few as possible." We read this letter as showing no chip on the shoulder and no evidence of such abnormal concern as to support the defendants' contention that from the start Meredith's letters indicate he was "belligerent", a "trouble-maker", and had psychological problems. We think it not unreasonable for a Negro to have some concern over his reception on the "Ole Miss" campus.

February 4, 1961, two days before registration began for the second semester, the Registrar telegraphed Meredith:

"For your information and guidance it has been found necessary to discontinue consideration of all applications for admission or registration for the second semester which were received after January 25, 1961. Your application was received subsequent to such date and thus we must advise you not to appear for registration."

In his holding on the preliminary injunction, the trial judge found as a fact that this first refusal of admissions was a proper refusal because of "overcrowded conditions".[6] In February 1961, however, there were only 2500 to 2600 male students on the campus. As of September 1961, as the Director of Student Personnel testified, there were about 3000 male students on the campus.

February 20 Meredith wrote the Registrar requesting that his application be treated as a continuing application for admission during the summer session. He called attention to his transcripts having been forwarded from the universities he attended. He concluded, "Again, I would like to express my gratitude for the respectable and humane manner in which you are handling this matter and I am very hopeful that this procedure will continue." The next day his room deposit of ten dollars was returned.

February 23 Meredith returned the ten dollars, explaining that he had requested

his application be considered for the summer session. After waiting a month for an answer Meredith wrote the Registrar again. This time he requested that his application be considered as a continuing one for the summer session and for the fall session. He inquired whether his transcripts had been received and whether there were "any further prerequisites to admission". After waiting eight days for an answer, and apparently thoroughly alarmed by eloquent silence from the University, Meredith again wrote the Registrar. It is the letter of a man of perseverance, but a man of patience and politeness. He asked the Registrar to please let him have the University's evaluation of his credits acceptable to the University "if it [were] appropriate at [that] time". He enclosed five certificates certifying to his good moral character and recommending him for admission to the University; the earlier letters were silent on the subject of recommending him. He said that he "realize[d] that [he was] not a usual applicant to the University of Mississippi, and that some timely items might need to be considered".

Another month went by. Still no answer. April 12 Meredith wrote the Dean of the College of Liberal Arts at the University. In laconic style, barren of comment, Meredith told of his application and his unanswered letters. He concluded:

"When I forwarded my application to Mr. Ellis on January 31, 1961, I stated in a letter to him and in my application that I am a Negro citizen of Mississippi. Because of my failure to hear from Mr. Ellis since his telegram to me of February 4, 1961, I have concluded that Mr. Ellis has failed to act upon my application solely because of my race and color, especially since I have attempted to comply with all of the admission re-

---

6. The Registrar sent telegrams to some thirteen or fourteen applicants. He testified that probably as many as 50 to 100 students were not permitted to submit applications. The Registrar also testified

that the cutoff was not a sudden decision but was the culmination of a review toward establishing cutoff dates to improve the quality of student personnel.

quirements and have not been advised of any deficiencies with respect to same. ¶ I am, therefore, requesting you to review my case with the Registrar and advise me what admission requirements, if any, I have failed to meet, and to give me some assurance that my race and color are not the basis for my failure to gain admission to the University."

The Dean did not repy to this letter. Belatedly, May 9, the Registrar replied, advising Meredith that "the maximum credit which could be allowed is forty-eight semester hours [for the 90 hours submitted] if your application for admission as a transfer student should be approved". The letter asked Meredith to "please advise if you desire your application to be treated as a pending application".

Meredith took this as a good omen. May 15 he wrote that he wished to attend the first term of the session starting in June, and that it was imperative he be informed with respect to his admission because he would have to make arrangements for his family. He enclosed a letter to the Director of Men's Housing, applying for an apartment appropriate for his family size—a wife and small child. Not having received an answer by May 21, Meredith wrote again. He said that since the Registrar had asked if his application should be considered as pending, he had "assumed by the nature of [the] request that [his] application was entirely complete and that [he had] met all of the pre-registration requirements".

The axe fell May 25, 1961. On that date the Registrar closed his correspondence file on the application and returned the money Meredith had deposited. He gave the following reasons for returning admission:

"The University cannot recognize the transfer of credits from the institution which you are now attending since it is not a member of the Southern Association of Colleges and Secondary Schools. Our policy permits the transfer of credits only from member institutions of region-al associations. Furthermore, students may not be accepted by the University from those institutions whose programs are not recognized. ¶ As I am sure you realize, your application does not meet other requirements for admission. Your letters of recommendation are not sufficient for either a resident or a nonresident applicant. I see no need for mentioning any other deficiencies."

We pause in narrating the facts to observe that the explanation is inadequate on its face. (1) It ignores the credits from Washburn, Kansas, and Maryland. (2) The "programs" from those institutions are of course "recognized" by Mississippi. As for Jackson State, its program was established and is supervised by the identical Board of Trustees supervising the program at the University of Mississippi. (3) The letters of recommendation refer to the requirement of alumni certificates, a patently discriminatory device.

Up to this point the University had successfully avoided decisive action on the 1961 Fall term. And, because of the lateness of the hour, the University was in a favorable position to resist the expected assaults on the summer sessions.

### III.

May 31, 1961, Meredith filed a complaint in the United States District Court for the Southern District of Mississippi. The defendants were the Board of Trustees of the State Institutions of Higher Learning, the Chancellor of the University of Mississippi, the Dean of the College of Liberal Arts, and the Registrar of the University. The Governor of Mississippi appoints the Board with the consent of the state senate. The Board, a constitutional body, is vested with the management and control of all Mississippi's colleges and universities, including the Negro colleges.

The complaint is filed as a class action. It alleges that the defendants are pursuing a state policy, state practice, state custom, and state usage of maintaining

and operating separate state institutions of higher learning for the white and Negro citizens of Mississippi; that under this policy Meredith was denied admission to the University solely because of race and color. At the first hearing the plaintiff was denied permission to introduce evidence relating to other colleges and universities in Mississippi. (In view of the theory of the complaint that segregation was a state policy being carried out by the Board charged with administering all of the state's institutions of higher learning, this ruling was clearly erroneous.) The evidence, therefore, relates only to the University.

At the time the complaint was filed counsel for Meredith sought a restraining order; the summer term was about to begin. The trial judge denied the order.

The case was set for a hearing on the plaintiff's motion for a preliminary injunction, June 12, 1961. This was four days *after* commencement of the summer session. About 3:30 p.m. on the afternoon of the hearing the trial judge stopped the trial and continued the case on the ground that because of his crowded docket he had set aside only one day to hear the case. The case was continued until July 10, 1961, at which time, according to the court, the entire case would be heard since, in the interim, the answer would be filed, the issues "definitely framed and we can begin the case and finish it." In practice, in almost all cases, a hearing on a motion for a preliminary injunction is held before an answer is filed.

The case was not heard on July 10 because of a scheduled three-judge court case which required the presence of the trial judge below and involved counsel for both parties. Meredith's counsel therefore filed, June 29, another motion for a preliminary injunction, since the second summer term would commence July 17. The motion was fixed for a hearing on July 11. On July 10 the chief counsel for the defendants, Assistant Attorney General Shands, was ill. His illness caused the case to be continued to August 10, 1961. By that time any pos-

sibility of attending the second summer session had gone winging.

June 9 and 30, 1961, and again July 27, July 28, and August 4, 1961 Meredith's counsel sought to take the Registrar's deposition. The efforts were singularly unsuccessful. The trial judge denied the first motion on the ground that the deposition could not be taken prior to the expiration of twenty days from the filing of the complaint. See Fed.R.Civ.Proc. 26. The second notice of taking was suspended and stayed by the court on the ground of Mr. Shands' poor health, June 27, two weeks before the July 10 postponement of the trial. August 1 the trial judge vacated the other three notices on the ground that the court was "in the process of trial on plaintiff's motion for Temporary Injunction, and the exercise of [the] court's discretion". This appears to us to have been a clear abuse of judicial discretion.

Counsel for Meredith filed a motion that the University produce records of all students admitted to the February 1961 term, the 1961 summer terms, and the September 1961 term for inspection July 1 to July 7. The motion, filed June 20, was not heard until July 27, because of Mr. Shands' ill health and because of the crowded court calendar. August 1 the district court ordered the records produced for inspection, but limited inspection of records to applications for undergraduate enrollment in the 1961 summer terms, and to the applications to the graduate schools. This order was manifestly erroneous and was one of the causes for the poor state of the record in the hearing for the preliminary injunction.

July 10 the trial judge announced that the hearing on August 10 would be a trial on the merits. August 1 this ruling was reversed; the trial judge ruled that the August 10 hearing would be a continuation of the June 12 hearing on the preliminary injunction.

July 19 the defendants filed their answer. The answer supplemented the Registrar's letter of May 25 by giving a large number of additional reasons, many

of them trivial, for the University's having refused Meredith admission. The answer emphasizes the following reasons. (1) Meredith failed or refused to submit the requisite alumni certificates. (2) Meredith "was not seeking admission to the University of Mississippi in good faith for the purpose of securing an education", considering all of the circumstances and particularly the fact that as a consequence of transferring to the University he would lose credits and G.I. benefits. (3) Meredith's fear that his application might be denied because of his race "shocked, surprised and disappointed" the Registrar. It was so "rash" and "unjustified" that it raised grave questions as to Meredith's "ability to conduct himself as a normal person and a harmonious student on the campus of the University of Mississippi." The Registrar, for himself and the other defendants, all of whom adopted his answer, denied that "he understands and interprets the policy of the State of Mississippi as being that negroes and whites are educated in separate institutions of higher learning".[7]

August 10 the hearing on the motion for a preliminary injunction which commenced and was adjourned June 12, was resumed. But on August 11, it was recessed again. Mr. Shands had to appear in another court August 14 on motions he had filed in another suit. The hearing resumed August 15 and concluded August 16.

At the end of this hearing, the trial judge gave the defendants until September 5 to file their brief, and the plaintiff ten days thereafter to file a reply brief.

The last date to register for the fall semester was September 28. The trial judge did not decide the case until De-

---

7. Mississippi's strong policy in favor of segregation is reflected in its statutes. Mississippi, in addition to enacting a resolution of interposition, enacted a statute requiring all members of the executive branch of the state government to prevent implementation of Brown v. Board of Education and enforce segregation in the public schools and other public facilities "by any lawful, peaceful and constitutional means" (Miss.Code, 1942 § 4065.-3). There is no statute limiting admissions to the University of Mississippi but Mississippi State College is limited to white males (Miss.Code, 1942, § 6694); Alcorn Agricultural and Mechanical College was established in 1878 for the education of the colored youth (Miss.Code, 1942, § 6703); Mississippi State College for Women is also limited to white students (Miss.Code, 1942, §§ 6711 and 6714); Jackson State College for Negro Teachers, now known as Jackson State College, is the institution of higher learning which appellant now attends (Miss.Code, 1942, §§ 6808-01, 6809). The Board of Trustees has statutory authority to provide graduate and professional instruction for Negro youth outside the State "when such instruction is not available for them in the regularly supported * * * institutions of higher learning" (Miss.Code, 1942, § 6726.5). Moreover, in 1959 the State Sovereignty Commission of Mississippi issued a report on the state's Negro and white schools, teachers and colleges. This report states the following:

The 1958–1959 allocation of state appropriated funds for Senior Colleges broken down on the basis of the amount allocated per student, is as follows:

1. Alcorn A. & M. College — (Negro) .............. $747.65
2. Mississippi Vocational — (Negro) .............. 725.09
3. University of Mississippi — (White) .............. 675.69
4. Delta State College — (White) .............. 652.54
5. Miss. State College for Women — (White) .... 552.53
6. Jackson State College — (Negro) .............. 476.47
7. Mississippi State University — (White) ........... 454.67
8. Mississippi Southern College — (White) ............ 387.10

Race Relations Law Reporter 467 (1959). There is a state constitutional provision and several state statutes requiring segregation in the public schools. E.g., Miss.Constitution, 1956, Art. 8, § 207; Miss.Code, 1942, § 6220.5, 6328.03.

It is common knowledge that the white universities listed above will not engage in any athletic contest with any university having Negro players on its team. In 1961 Mississippi State, basketball champions of the Southeastern Conference, declined an invitation to play in the N.C.A.A. tournament for the national championship.

cember 12. He entered an order in favor of the defendants December 14, 1961. That shot the first semester of 1961–1962. The commencement of the second semester was not far off—February 6. Immediately following entry of the order, Meredith's counsel filed a notice of appeal and moved this Court for an order advancing the appeal. This Court heard the appeal January 9 and rendered its decision January 12. We affirmed the district court's denial of the motion for a preliminary injunction. We suggested that the district court proceed promptly with a full trial on the merits.

■ In that decision we disposed of one of the reasons the University stressed in rejecting Meredith—the requirement that he furnish alumni certificates. We held that such a requirement is a denial of equal protection of the laws in its application to Negro candidates for admission. Again we pause, this time to say that if there is any question as to the scope of that ruling, we now hold that the requirement of recommendations, whether from alumni or from citizens generally, attesting to an applicant's good moral character or recommending an applicant for admission, is unconstitutional when, as this case demonstrates, the burden falls more heavily on the Negroes than on whites. This is not to say, of course, that good moral character is not a reasonable test for admission.

We held that on "the muddy record" before us it was "impossible to determine whether there were valid, nondiscriminatory grounds for the University's refusing Meredith's admission". We made certain observations for the guidance of the district judge presiding at the trial.[8] We emphasized that, *"Within proper legal bounds,* the plaintiff should be afforded a fair, unfettered, and unharassed opportunity to prove his case".

The trial on the merits set for January 15, 1962, commenced January 16. At 2:00 p. m. on that date it was postponed until 3:00 p. m. January 17, to give the defendants' counsel an opportunity to confer with the defendants. At 3:00 p. m. January 17 the defendants' counsel moved for a continuance on account of Mr. Shands' illness; he was hospitalized. The two special assistants stated to the court that they were not prepared to proceed with the trial. The district court continued the case until 2:00 p. m. January 24, 1962.

Before the trial, the district court quashed that part of a subpoena requiring the Registrar to produce admission records for the February 1961 term; the Registrar was required to produce only records commencing with the first summer term. This holding, seriously handicapping plaintiff's counsel, apparently overlooked our ruling in the earlier opinion: "The limitation of evidence to that pertaining to the summer session of 1961 is clearly erroneous. It is erroneous since the policy and practice of the University in admissions were at issue."

February 5, 1962, the district judge entered an order denying all relief requested and dismissing the complaint. The same day, the plaintiff appealed to this Court and also filed a motion for a preliminary injunction pending appeal on the ground that unless Meredith were admitted to the February 1962 term, the case would become moot. This Court heard the motion February 10. A majority of the Court, Chief Judge Tuttle dissenting, denied the motion February 12. 305 F.2d 341. Still anxious to give this case full study on an adequate record, we held that the appeal would not necessarily be moot; that Meredith could avoid the mootness by attending Jackson State College for one quarter of the school year or by being permitted to choose courses not necessarily leading to his graduation. Meredith pursued the latter course.

The net effect of all these delays was that the February 1961 term, the two summer terms of 1961, and the two regular terms of 1961–62 slipped by before the parties litigant actually came to a showdown fight. Some of these delays,

8. See 298 F.2d 696, 702.

as in any litigation, were inevitable. Some are attributable to continuances of doubtful propriety and to unreasonably long delays by the trial judge. We refer, for example, to the delay between the end of the trial, August 16, and the entry of the district court's order, December 14. Many of the delays resulted from the requests of defendants. We do not question Mr. Shands' good faith or the fact of his illness, but the Attorney General's Office is well-staffed.[9] And— there are plenty of lawyers in Mississippi ready, able, and more than willing to represent the University. We draw the inference that not a few of the continuances and the requests for time in which to write briefs were part of the defendants' delaying action designed to defeat the plaintiff by discouragingly high obstacles that would result in the case carrying through his senior year. It almost worked.

As a matter of law, the principle of "deliberate speed" has no application at the college level; time is of the essence. In an action for admission to a graduate or undergraduate school, counsel for all the litigants and trial judges too should be sensitive to the necessity for speedy justice. Lucy v. Adams, N.D. Ala., 1955, 134 F.Supp. 235, aff'd 5 Cir., 228 F.2d 619, cert. den. 351 U.S. 931, 76 S.Ct. 790, 100 L.Ed. 1460; see also 350 U.S. 1, 76 S.Ct. 33, 100 L.Ed. 3, and State of Florida ex rel. Hawkins v. Board of Control, 1956, 350 U.S. 413, 76 S.Ct. 464, 100 L.Ed. 486.

## IV.

We turn now to the reasons the University gave in its letter of May 25 for rejecting Meredith.

### A. Alumni Certificates—Letters of Recommendation

1. One of the most obvious dodges for evading the admission of Negroes to "white" colleges is the requirement that an applicant furnish letters or alumni certificates. The Board established the requirement by resolution, November 18, 1954, just a few months after the Supreme Court decided Brown v. Board of Education. We mention it again at this point in the opinion because its adoption and incorporation in current Bulletins (Catalogues) of the University show affirmative action by the Board to evade desegregation. The action unquestionably was part of conscious University and State policy. It was action that must have been preceded by discussion among members of the Board.

The University's continued use of the requirement seems completely unjustifiable in view of decisions denying the use of such certificates at Louisiana State University and at the University of Georgia. Since at least 1958, when Ludley v. Board of Supervisors, Louisiana State University, E.D.La., 150 F.Supp. 900, aff'd, 5 Cir., 252 F.2d 372 (cert. den., 358 U.S. 819, 79 S.Ct. 31, 3 L.Ed.2d 61) was decided, the Board has been on notice that the courts construe such a requirement as an unconstitutional discrimination against Negroes. If the Board had any doubt about it, that doubt should have been resolved in 1959 when a similar requisite of the University of Georgia was held to be unconstitutional. Hunt v. Arnold, N.D.Ga., 172 F.Supp. 847 (not appealed). We regard the continued insistence on the requirement as demonstrable evidence of a State and University policy of segregation that was applied to Meredith.

2. Although defendants' counsel deny that the alumni certificates were for discriminatory purposes or had discriminatory effects, they assert that the enabling resolution of the Board was an administrative order having the effect of a state statute. For this reason, they say that a three-judge court should have passed on the constitutionality of the

---

9. There are nine lawyers on the Attorney General's staff. Of counsel for the defendants in this case, in addition to Mr. Shands, were an Assistant Attorney General and two Special Assistants. The Assistant Attorney General and one of the Special Assistants carried the brunt of the appellate arguments before this Court.

certificates. (This position is, of course, inconsistent with the defendants' we-still-say-its-scissors denial of any state policy of segregation in Mississippi's colleges.) We hold that the Board resolution was an administrative order having an effect similar to a statute, and that it constituted a broad state policy and university policy. We hold, however, that its manifest unconstitutionality makes a three-judge court unnecessary. Ex Parte Poresky, 1933, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152; Turner v. City of Memphis, W.D.Tenn., 1961, 199 F.Supp. 585, vacated, 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed. 2d 762; Bailey v. Patterson, S.D.Miss., 1961, 199 F.Supp. 595, vacated, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512.

3. The evidence also shows that the requirement of alumni certificates was discriminatorily applied to Meredith. The Registrar testified that the files of white transfer students admitted to the 1961 summer session contained letters of recommendation which did not mention good moral character. He explained that such students were permitted to register pending the receipt of all required certificates. No such latitude was extended Meredith.

B. The University's Policy Regarding Transfer Students from Non-Member Colleges of Regional Associations.

February 7, 1961, just six days after the University received Meredith's application, the Board adopted the following resolution:

"[T]hat all state supported Institutions of Higher Learning may accept transfer students from other state supported Institutions of Higher Learning, private colleges or denominational colleges only when the previous program of the transferring colleges is acceptable to the receiving Institution, and the program of studies completed by the student, and the quality of the student's work in said transferring college is acceptable to the receiving Institution and to the Board of Trustees."

This resolution stiffens the policy as stated in the University Bulletin, General Catalog, Issue 1960:

"ADMISSION FOR TRANSFER STUDENTS: ADVANCE STANDING. Students may be admitted from *other approved institutions* of higher learning upon presentation of official transcripts of credits which certify honorable dismissal and eligibility for immediate readmission." (Emphasis supplied)

The May 25 letter advised Meredith that he was denied admission because "students may not be accepted by the University from the Institutions whose programs are not recognized." Translating, the Registrar said that this means that Meredith could not transfer to the University because Jackson State College was not a member of the Southern Association of Colleges and Secondary Schools. It also means that the Board, which runs Jackson State too, could set up at Jackson State and other Negro colleges a program inherently incapable of ever being approved.

But this reason is no longer valid. December 16, 1961, Jackson State was admitted to membership in the Association.

The reason was never valid, and again demonstrates a conscious pattern of unlawful discrimination.

Before December 1961, as the Registrar testified, not one of the three Negro colleges was a member of the Association. They were, however, on the Association's *approved* list of Negro Colleges. At the time Meredith applied for admission, the University catalogue, as quoted, provided that transfer students might be accepted from another "approved Institution of Higher Learning". The College Accrediting Commission of the State of Mississippi (Miss.Code, 1942, § 6791.5) has approved Jackson State College.

In defending its position the University draws a distinction between "accepting" credits and "recognizing" credits, a

distinction that eludes the Court.[10] The defendants' explanation is that "the justification for only recognition was the fact that the appellant could not transfer from Jackson State College". Any reasonable interpretation of the resolution would limit its effect to transfer students with credits only from non-approved or non-accredited colleges. It seems to us indefensible to ignore Meredith's attendance at such accredited universities as Maryland, Kansas, and Washburn on the excuse that his last college was Jackson State.

At the trial, plaintiff's counsel inspected 214 files of students denied admission to the Summer Sessions of 1961, the September Session of 1961, and the February Session of 1962. Not one was a student who had credits from both accredited and non-accredited colleges. Thus, Meredith was not in the same category with any other student *denied admission* for lack of credits. There were six instances of students denied transfer from non-accredited schools; these students of course, had no credits to transfer. In five instances the applicant had attended only the one non-accredited school from which he requested transfer. One was in the same academic class as the plaintiff, in the sense that he had attended an accredited school, Bucknell. Unlike Meredith's transcripts, his Bucknell transcript stated: "Permitted to withdraw. Academic status unsatisfactory." At the time of his application he was taking a course in English composition at an unaccredited junior college and a remedial reading class somewhere else. Even so, in spite of his miserable record, the Registrar advised the boy's mother that the University of Mississippi would admit him on probation if he were eligible to return to Bucknell and if he maintained a "D" average. Thus, Meredith was not treated the same as another in the same category but with an inferior record.

In short, the transfer policy was both discriminatorily applied and irrationally construed in order to bar Meredith's admission

### C. Transfer of Credits from Jackson State

May 9, 1961, the Registrar wrote Meredith a letter in which he evaluated Meredith's 90 semester credits at 48 semester hours. Six days later, just ten days before the axe fell on May 25, the Committee on Admissions adopted a policy of accepting "credits only from institutions which are members of a regional accrediting association or a recognized professional accrediting association."

Jackson State's admission as a member of the Southern Association of Colleges and Secondary Schools removes this policy as a bar to accepting Meredith's credits from that school. At the trial the Registrar testified that the policy operated to preclude acceptance of only the Jackson State credits. It is impossible to understand, therefore, why in the letter of May 25 the Registrar gave as the first reason for turning Meredith down that the "University cannot *recognize* the transfer of credits from [an] institution which * * * is not a member of the Southern Association of Colleges and Secondary Schools." On the Registrar's own evaluation, Meredith had enough credits to be transferred as a sophomore. There is no suggestion in any of the correspondence that Meredith insisted on being transferred as a junior or that the university recognize all his credits.

We draw the inference again that the assigned reason for rejecting Meredith was a trumped-up excuse without any basis except to discriminate.

Thus far, we have covered all of the specific reasons given in the May 25 letter. On the record, as of May 25, 1961, the University had no valid, non-discrim-

---

10. Counsel for the defendants, drawing another fine distinction, argue that the University "gave a tentative evaluation of twelve hours to Jackson State College work earned, but that no credit was given for such work". There are more obstacles in sight on the matter of these credits: even though Jackson State is now an accredited member of the Southern Association, the Registrar finds that he does not know whether that membership will have a retroactive effect on credits from Jackson State.

inatory grounds for refusing to accept Meredith as a student.

## V.

■ A college registrar is entitled to take advantage of play in the joints in administering an office frequently requiring deliberate ambiguity and conscious confusion in order not to offend the delicate sensibilities of some college student and his parents. We recognize the necessity for such latitude and the sagacity of the final clause in the Registrar's letter of May 25, "I see no need for mentioning any other deficiencies." But the reasonable discretion permissible in an admissions policy cannot be exercised to bring about unlawful discrimination.

We take up now the ex post facto rationalization of the turndown. It may be debatable whether the Court should consider any newly originated reasons and any post-May 25 evidence, but we sit as a court of equity. Consideration of such matters cuts both ways; the plaintiff seeks to take advantage of the new status of Jackson State College. In an analogous situation, in labor cases, evidence of a discriminatory discharge or other unfair labor practice occurring after the filing of the charge upon which the complaint is based may be considered by the National Labor Relations Board and the reviewing court. N. L. R. B. v. Fant Milling Co., 1959, 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243.

### A. The Alleged False Registration: A Frivolous Defense

The defendants attempted to show Meredith swore falsely before the Circuit Clerk of Hinds County in making application to register as a voter, swearing that he was a citizen of Hinds County when he knew he was a citizen of Attala County. In his opinion on the merits, the district judge declined to make a finding of fact on this point "since these facts were not known to the Registrar at the time the application was rejected," and "concluded that this testimony should not be considered" in reaching his conclusions. In his opinion on the motion for a preliminary injunction the district court said that the *defendants* "brought out on cross examination that after [Meredith] entered Jackson State * * * he swore falsely that he was a citizen of Hinds County". The district court made no finding on the alleged "false swearing", although it found that Meredith "was and is now a citizen of Attala County, Mississippi."

The complaint alleges that Meredith is a resident of Hinds County. Jackson State College is in Hinds County. Meredith registered to vote in Hinds County. That is where he lived with his wife and child. J. R. McLeod, Deputy Clerk of Hinds County registered Meredith after he received complete and accurate information from Meredith with regard to his residence. He testified that Meredith was properly registered and was "qualified to vote" in Hinds County.

Section 251 of the Mississippi Constitution prohibits registration of an elector in the four months preceding any election at which he offers to vote. But "no person who, in respect to age and residence, would become entitled to vote within the said four months, shall be excluded from registration on account of his want of qualification at the time of registration".

Meredith's residence in Hinds County with his wife and child began September 1960. He registered in Hinds County February 2, 1961, which he had a right to do under Section 251 of the state constitution. As McLeod testified, "he had moved into Hinds County in time to have been qualified to have voted in 1961 (sic) since he moved in prior to the general election in 1960 * * * and on that basis I registered him". He said: Meredith "had stayed there past the general election on Tuesday after the first Monday of November which put him past one general election, and then he would have lived there a year before the next ensuing general election which would be Tuesday after the first Monday in November of '61. * * * *Yes, he was qualified to vote in Hinds County.*"

There is no false statement in the registration application Meredith filled

**356**

out except the date. This he inadvertently wrote "February 2, 1960" when it was in fact February 2, 1961; the Poll Tax Exemption Certificate for Service Men, which McLeod filled out for Meredith at the same time he registered, is properly dated February 2, 1961. Meredith correctly gave September 30, 1960, as the date his residence began in Jackson, in Hinds County. There can be no question therefore of any deception on his part. He stated that his prior place of residence was Koscuisko. It seems clear to us that he was open and straightforward. Meredith testified:

> "I told him [the deputy clerk, McLeod] that I had been in the service [in order to qualify for a Poll Tax Exemption Certificate]. I told him that I had never lived in Hinds County [He had not previously; the application shows the date his residence in Jackson commenced]. I told him that I had always lived in Attala County. [True enough, and necessary as a predicate for the poll tax exemption] * * * I was going to Jackson State College and wanted to register and vote in [Jackson] Hinds County, as the voting place most convenient and closest [to his residence] * * * I explained my whole situation to the man when I went up to register to vote".

The testimony of the deputy fully supports Meredith's testimony and the correctness of the statements in the sworn affidavit.

There is confusion in some of the testimony. Mr. Shands caused some of the confusion by repeatedly referring to the Poll Tax Exemption Certificate as the registration application. (Meredith had taken this certificate out of his pocket and was holding it in his hands during the examination.) The plaintiff caused some of the confusion by polite "Yes Sir's" to some of Mr. Shands's leading questions, (e. g. "You knew it was untrue"). In the printed record these "Yes Sir's" appear at first glance to be admissions of false statements. Examining the record closer, it is evident that Meredith made no admissions of any false statements; the "Yes Sir's" simply indicate Meredith was attentive and following the questions.

We hold that the contention is frivolous. We have gone into the facts in some detail only because they show a determined policy of discrimination by harassment.

### B. Meredith a Troublemaker

The Registrar, relying on his interpretation of Meredith's character from the correspondence and from the testimony, testified that he would have to deny Meredith admission *now*. He said, Meredith "would be a very bad influence" at the University: item one, Meredith was "a man who has got a mission in life to correct all of the ills of the world". The defendants rely more importantly on excerpts from admittedly incomplete Air Force records to support their conclusion that Meredith was "a trouble maker" who has "psychological problems in connection with his race".[11]

Taken out of context, some portions of Meredith's record lend support to the defendants' position. The most damaging bit is a psychiatry report dated April 29, 1960:

> "This is a 26 year old negro S Sgt who complains of tension, nervousness and occasional nervous stomach. Patient is extremely concerned with the 'racial problem' and his symptoms are intensified whenever there is a heightened tempo in the racial problems in the U S and Africa. Patient feels he has a strong need to fight and defy authority and this he does in usually a passive procrastinating way. At times he starts a crusade to get ex-

---

11. One of the defendants' attorneys happened to be in St. Louis, one of the Air Force Record Centers, on personal business; while there he selected excerpts from Meredith's records. Defendants admit that Meredith cooperated fully in giving them permission to examine his records.

isting rules and regulations changed. He loses his temper at times over minor incidents both at home and elsewhere. No evidence of thinking disorder. ¶ Diagnosis: Passive aggressive reaction, chronic, moderate. ¶ Recommendations: No treatment recommended. Patient declined any medication."

It is certainly understandable that a sensitive Negro, especially one overseas, might have a nervous stomach over the racial problem. There must be a good many Negroes stateside with similar abdominal reactions. We find it significant that the psychiatrist found "no evidence of a thinking disorder", that he found Meredith's "strong need to fight and defy authority" took a "passive" form,

and that no treatment was recommended. Meredith, incidentally, voluntarily went to the psychiatrist.

The defendants expressly admit in their brief that Meredith had a good record during his first enlistment. They count on a general deterioration of attitude allegedly demonstrated in his last efficiency report. This report is for the period November 3, 1959 to July 18, 1960 at San Francisco, California, although the reporting official who made out the fitness report had directly supervised Meredith only two months. The reporting official's comments should be compared with the comments in the report dated May 22, 1959.[12] It furnishes no basis for down-grading Meredith as a psychological risk on the campus. The

12. The comments of the reporting official for the report dated 18 July 1960 are:

"*Facts and Specific Achievements:* During this reporting period, Sgt Meredith took a negative attitude toward most of the jobs assigned him. He ignored the maintenance of NAMAP Form 44, individual training record, even though this form was reviewed with him, and he was specifically assigned this duty. He further failed to maintain an accurate record of items covered at Commander's Call, for future reference. A recommended method of such recording was explained to him, and he was directed to maintain this each month. His maintenance of the squadron duty roster was far below what he is capable of, and he exercised no tact or diplomacy in dealing with persons of equal or higher rank, thus causing much unnecessary friction and ill feeling. He did render much assistance and display his resourcefulness in connection with the recent squadron display for Armed Forces Day.

*Strengths:* Sgt Meredith has taken advantage of many opportunities to further his own education, and has counseled and encouraged many airmen to do likewise. He has a quick mind, capable of clear thinking, and is not content to merely ride with the tide.

*Recommended Improvement Areas:* In the opinion of this writer, the area most needing improvement in Sgt Meredith's case is his outlook on the world in general, and more especially those to whom he owes allegiance, at present the squadron to which he is assigned and the United States Air Force. Further, he should rid himself of his antagonistic at-

titude, and develop a spirit of cooperation.

*Suggested Assignments:* Sgt Meredith has expressed a desire to leave the Air Force, and has forfeited his opportunity to reenlist. Inasmuch as I feel his intended course of action will be best for both himself and the Air Force, I can make no recommendation for future assignments."

The comments of the reporting official (a different man) for the report dated May 22, 1959 are:

"*Strengths:* SSgt Meredith is interested and very active in educational activities. He expends a great deal of effort to expand his own education. He is Education NCO for the Squadron. He also supports the Squadron athletic program in his capacity as Athletic NCO.

*Recommended Improvement Areas:* SSgt Meredith is not always tactful in dealing with other people. He allows himself to become upset too easily, and this is a strong contributing factor to his problem of displaying tact. In this situation, he loses his otherwise normally effective expression. He is aware of these occasional tendencies, and is making progress to improve in these areas.

*Facts and Specific Achievements:* SSgt Meredith carries out his duties in an effective and satisfactory manner. He volunteered for and is performing the extra duties of Education NCO and Athletic NCO for the Squadron. In his capacity as Education NCO, he takes a genuine interest in the educational problems of the airmen in the Squadron and assists them by advising and counseling them on improving their education. SSgt Meredith

rating official thought that Meredith had a "negative attitude toward most of the jobs assigned him" (he was leaving the service in a couple of months); that Meredith "exercises no tact or diplomacy in dealing with persons of equal or higher rank, thus causing unnecessary friction"; that he needed improvement in his outlook on the world, more allegiance to his squadron and the Air Forces, less of an "antagonistic attitude" and more of a "spirit of cooperation". But he also wrote: "Sgt. Meredith has taken advantage of many opportunities to further his own education, and has counseled and encouraged many airmen to do likewise. He has a quick mind, [is] capable of clear thinking, and is not content to merely ride with the tide". The rating sergeant checked a blocked form stating: "Sometimes creates friction. Slow to help others"; but he typed out: "He did render much assistance and display his resourcefulness in connection with the recent squadron display for Armed Forces Day". Every other checked block was favorable: "Knows all routine duties with some knowledge of more complex duties; completes most assigned duties satisfactorily; always understands instructions when given in detail; frequently seeks out opportunities to improve himself; succeeds under favorable conditions; usually conserves men, money, and material by implementing and maintaining routine management procedures; and accepts most responsibilities when specifically assigned."

Summarizing "Suggested Assignments", the reporting official, a sergeant, stated: ."I feel [Meredith's] intended course of action [leaving the Air Force] will be best both for himself and the Air Force". He did not recommend Meredith for promotion. But Meredith's immediate supervisor, the Adjutant, a lieutenant, and the Unit Commander, a major, disagreed. They recommended Meredith for promotion "along with other airmen of equal service and experience."

One short answer to the defendants' contention is the Good Conduct Medal. Another short answer is that Meredith's record shows just about the type of Negro who might be expected to try to crack the racial barrier at the University of Mississippi: a man with a mission and with a nervous stomach.

## C. Bad Character Risk

The defendants are scraping the bottom of the barrel in asserting that the University should not now admit Meredith because he is a bad character risk. They rely on (1) the frivolous charge of false swearing, previously discussed, (2) alleged misrepresentation by Meredith in obtaining letters of recommendation from Negroes who knew him in Attala County before he entered the Service, and (3) certain trivia.

At the trial on the merits defendants' counsel introduced affidavits from four of the five Negroes who had written letters of recommendation for Meredith. These affidavits purport to show that Meredith obtained his letters by misrepresentation. The affidavits were obtained by one of the Assistant Attorneys General of counsel in this case. He testified:

"The affiants were requested to come to the law office of Mr. John Clark Love, which they did on their voluntariness—they came of their own volition. When they arrived there, they were interviewed in the presence of the Justice of the Peace and in one instance by the Notary who was there present. They were asked various questions as to the good moral character of the plaintiff. They were asked under what

---

is one of the most financially responsible NCO's I have known. He manages his personal affairs in a commendable manner.

*Suggested Assignments:* Based on his background and his keen interest in the education area, SSgt Meredith should be most effective in an assignment where he would have the opportunity to work with base education programs.

*Other Comments:* This report and all ratings given have been discussed with SSgt Meredith. SSgt Meredith does not supervise DAFC or Japanese National personnel."

conditions had the previous or the first certificates which accompanied the application—under what conditions were they asked. And they replied that he stated that he was attempting to get a job and that was the reason the certificates were asked."

Mr. Love is a man of stature in the community. He is a State Senator and a former member of the State Sovereignty Commission.

There is no evidence of coercion. But the affidavits were drawn by the defendants' attorney and were taken in the presence of persons representing, to a country Negro, the power and prestige of The Establishment of Attala County and the State of Mississippi. The statements would have carried more weight had the affiants testified as witnesses in open court protected by the safeguards our system of law extends to witnesses. The defendants give no explanation for failing to call these affiants as witnesses.

None of the affidavits alleges that Meredith is a person of bad moral character. Only two of the four allege that Meredith represented that he needed the certificate to help obtain a job. Each alleges that the affiant did not know the certificate was to be used for admission to the University. Each alleges that the affiant had seen very little of Meredith since he left Koscuisko in 1949; that the affiant could not now certify to his good character nor recommend him for admission to the University of Mississippi.

An unsigned affidavit from the fifth affiant, the plaintiff's cousin, states: "At the time of the signing of this statement [the recommendation] I knew full well and was aware of the purpose for which such certificate was to be executed". This unsigned statement, unlike the executed affidavits, significantly is the only one that contains the following declaration: "I am not now nor have I ever been in any serious trouble or convicted of any crime or misdemeanor."

In sum, we consider it unreasonable to attach any substantial weight to these affidavits. They do not carry enough weight in themselves nor in connection with the evidence as a whole of Meredith's character to justify a reasonable belief that Meredith is a bad moral risk as a University student.

The other asserted "evidences" of bad moral character are trivia. The defendants contend that:

1. Meredith was "adamant [in] refus[ing] to properly get and send to the Registrar certificates from Alumni as to his good moral character"; further, "those certificates which he sent in lieu of the Alumni certificates never were valid certificates as they are absolutely silent as to the position or standing of the certifiers in the community".

2. Meredith admitted that he brought stationery with him from the Air Force. (This refers to a few sheets of surplus stationery. This question as to his honesty led to inquiries as to government property being in his possession and required the production of the serial number of a typewriter purchased after his discharge.)

3. "Appellant was not a good character risk for he refused to list Wayne University in his application to the University, when the application required that the prospective applicant list all universities and colleges attended." (Meredith attended Wayne for two weeks only.)

These are on a par with the defense, asserted in the complaint, that one of the reasons for rejecting the application was that "all letters received by [the Registrar] from plaintiff were sent registered mail return receipt requested". Or with the defense, argued even now, that his application is incomplete because "appellant has not seen fit to forward a supplemental transcript from Jackson State". This transcript was introduced into evidence and is in the record. Meredith repeatedly asked the Registrar to advise him whether there was anything further he needed to do to complete his application.

The triviality of these and other of the defendants' contentions is a proper consideration for the Court in review-

ing the whole case to determine whether the University barred Meredith for good and valid reasons or in fact barred him because he was a Negro.

## CONCLUSION

■ There are cases when discrimination is purposeless but unlawful because of its effect. In this case the essence of the complaint is purposeful discrimination against Negroes as a class. The inquiry into purpose makes it especially appropriate for the Court:

(1) to study the case as a whole, weighing all of the evidence and rational inferences in order to reach a net result;

(2) to consider the immediate facts in the light of the institution's past and present policy on segregation, as reflected not only in the evidence but in statutes and regulations, history and common knowledge;

(3) to measure sincerity of purpose against unreasonable delays and insubstantial reasons asserted for the institution's actions;

(4) to compare the actions taken with regard to the plaintiff with actions taken with regard to others in the same category;

(5) to pierce the veil of innocuity when a statute, regulation, or policy necessarily discriminates unlawfully or is applied unlawfully to accomplish discrimination.

The defendants fail the test. There are none so blind as those that will not see.

The defendants' answer asserts and the Registrar testified that the State of Mississippi has no policy of educating Negroes and whites in separate institutions. This is in the teeth of statutes, only a few which need be cited for illustration.[13] It is contrary to official state publications with which every college official in Mississippi must be familiar. It defies history and common knowledge.

Similarly, the defendants assert that there is no policy of excluding Negroes at the University. The district judge found that there was a policy of segregation before Brown v. Board of Education was decided in 1954. The trustees and the principal officials of the University testified that after 1954 there has been no change in policy with respect to the admission of Negroes. They testified that the admission of Negroes had never been discussed in any meeting of the Board or in any meeting of the administrative staff. In spite of the enormous publicity given to this case by the newspapers, some of which are in evidence, the trustees and other individual defendants said that none of the officials of the University discussed Meredith's application in an official capacity. Even the Registrar had not discussed Meredith's application with anyone except with the Dean of the College of Liberal Arts, who had merely referred Meredith's letter to the Registrar, and with the Director of Development who agreed that Meredith was planning to file suit. The hard fact to get around is that no person known to be a Negro has ever attended the University. In a similar situation involving the University of Alabama the district court made the finding, which we affirmed, that:

"There is no written policy or rule excluding prospective students from admission to the University on account of race or color. However, there is a tacit policy to that effect." Lucy v. Adams, N.D.Ala., 1955, 134 F.Supp. 235, 239; aff'd 5 Cir., 228 F.2d 619; cert. den'd., 351 U.S. 931, 76 S.Ct. 790, 100 L.Ed. 1460.

The policy admittedly existed when, even under the Plessy v. Ferguson doctrine, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, Negroes were being admitted to other state universities because the facilities ("programs" here) of the Negro colleges were not equal to the facilities of white colleges. Sweatt v. Painter, 1950, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114;

13. See footnote 7.

McLaurin v. Oklahoma State Regents, 1950, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149. By an ironic twist, the defendants, *after* Plessy v. Ferguson has been overruled, seize upon the inferiority of the facilities-programs of Negro colleges as a reason for excluding Negroes at Mississippi's white colleges and universities.

Reading the 1350 pages in the record as a whole, we find that James Meredith's application for transfer to the University of Mississippi was turned down solely because he was a Negro. We see no valid, non-discriminatory reason for the University's not accepting Meredith. Instead, we see a well-defined pattern of delays and frustrations, part of a Fabian policy of worrying the enemy into defeat while time worked for the defenders.

The judgment of the district court is Reversed and the case Remanded with directions that the district court issue the injunction as prayed for in the complaint, the district court to retain jurisdiction.

DeVANE, District Judge dissents and his views will be published at a later date.

Before BROWN and WISDOM, Circuit Judges, and DeVANE, District Judge.

DeVANE, District Judge (dissenting).

Considered as a brief in support of appellant's case, the decision of Judge Wisdom is a masterpiece. I agree with almost everything he has to say in the opinion about the defenses advanced by appellees and I further agree that appellees scraped the "bottom of the barrel" in their efforts to keep Meredith out of the University of Mississippi. In so doing appellees weakened their case very much before this Court for on every ground save one the defenses advanced are not deserving of serious consideration by this Court.

The one defense that leads me to dissent is the fear expressed by the appellees that Meredith would be a trouble-maker if permitted to enter the University of Mississippi. Judge Wisdom sets out the evidence forthrightly in his opinion dealing with this issue and reaches the conclusion that it too is not a valid defense to the efforts of appellees to keep appellant out of the University. Considering the facts as he outlines them in his opinion, I disagree with the Court's conclusion on this issue.

Judge Mize heard the case, observed appellant throughout the trial and reached the definite conclusion from appellant's testimony, his conduct and other testimony that was offered that Meredith would be a troublemaker if permitted to enter the University. Under such circumstances, the opinion of Judge Mize is entitled to more weight than any conclusion that could be reached by Court of Appeals Judges where their opinion is based upon a cold, printed record of the facts at issue. This conclusion is supported by the last sentence in Judge Wisdom's opinion on this point, when he states:

> "Another short answer (to the defendants' contention) is that Meredith's record shows just about the type of Negro who might be expected to try to crack the racial barrier at the University of Mississippi: a man with a mission and with a nervous stomach."

In considering this matter, I recognize that the appellees never have, and probably never will, approve the decision of the Supreme Court of the United States in Brown, et al. v. Board of Education of Topeka, et al., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. Nevertheless, my approach to this issue, and I am sure it was the approach of Judge Mize, is the same as my approach to many laws District Judges are called upon to enforce where the District Judge would prefer that the law was otherwise. This has never deterred me in following the mandates of Congress and the Supreme Court insofar as the laws of the United States are concerned, and I am sure that it would not deter Judge Mize in ordering the appellees to admit Meredith to the University

of Mississippi, if he felt that the proof on this issue was not sufficient to support his decision to deny appellant's application for entry.

In passing upon this case, I do not consider that we have a right to ignore what the effect of this decision could be upon the citizens of Mississippi and I feel that it is the duty of our Courts to avoid where we can incidents such as the Little Rock case and I fear that the result of this decision may lead to another comparable situation, particularly for "a man with a mission and with a nervous stomach". Integration is not a question that can ever be settled by Federal Judges. It is an economic, social and religious question and in the end will be amicably settled on this basis.

In my opinion Judge Mize was correct in finding and holding that appellant bore all the characteristics of becoming a troublemaker if permitted to enter the University of Mississippi and his entry therein may be nothing short of a catastrophe.

I, therefore, dissent for the reasons stated above.