UNITED STATES of America

v.

Edward C. PYLE, Robert McQuilken, Bob Van Blunk and Arlene Whalin.

Crim. Nos. 80–218 to 80–221.

United States District Court, E. D. Pennsylvania.

June 23, 1981.

As Amended July 14, 1981.

Peter F. Vaira, U. S. Atty., Elizabeth Ainslie, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Mark Schaffer, Defender Ass'n of Philadelphia, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

By Order of April 21, 1981, this Court vacated judgments of conviction entered against four defendants in the magistrates' court below and remanded for a new trial. Defendants had been convicted of criminal contempt under 18 U.S.C. § 401 for having violated the terms of an injunction issued in litigation before another member of this Court. *See Resident Advisory Board v. Rizzo*, 503 F.Supp. 383 (E.D.Pa.1980). Following conviction, all defendants appealed. Jurisdiction over these appeals lies in this Court pursuant to 18 U.S.C. § 3402, which provides that "[i]n all cases of conviction by a United States magistrate an appeal of right shall lie from the judgment of the magistrate to a judge of the district court of the district in which the offense was committed." All defendants joined in attacking the judgments of conviction on the following four common grounds: (1) the magistrate did not have subject matter jurisdiction to try the defendants; (2) the defendants were denied their statutory right to a jury trial; (3) the magistrate should have disqualified himself as factfinder because he had tried other persons for contempt of the same injunction arising out of the same events; and, (4) the injunction is invalid for overbreadth, impermissibly infringing on First Amendment rights. In addition, each of three of the defendants raised separate challenges to the sufficiency of the evidence supporting his conviction.

Upon consideration of the issues raised on appeal here, this Court concluded that, while the magistrate did have subject matter jurisdiction to try the defendants and the injunction is not constitutionally defective, the defendants were nevertheless improperly denied their right to a jury trial conferred by 18 U.S.C. §§ 402 and 3691. Although the Court did not so state in its Order of April 21, the Court saw no need to decide whether the magistrate should have disqualified himself or whether there was sufficient evidence to support the convictions. The cases were remanded for a new trial before a jury.

Since the Court's entry of the Order vacating the judgments of conviction, defendants have filed a motion for clarification or

reconsideration of that Order. Defendants therein ask the Court to state whether it ruled on the sufficiency of the evidence to support the convictions. Having concluded, upon further consideration, that the proper course for the Court is to review the sufficiency of the evidence at the present stage of the litigation, the Court has done so and concludes that the evidence is sufficient as to all defendants *except* as to defendant Robert Van Blunk. Accordingly, an appropriate Order accompanies this Memorandum, modifying the Court's Order of April 21, 1981, by reversing the judgment of conviction and directing the entry of a judgment of acquittal as to defendant Van Blunk only.

This Memorandum is in support of the Court's Order of April 21, 1981, vacating the convictions and remanding for new trial, and in support of the Order which accompanies this Memorandum now being entered in response to defendants' motion for clarification or reconsideration, reversing the judgment of conviction and directing the entry of a judgment of acquittal with respect to defendant Van Blunk.

I. *Statement of the Case*

The contempt proceedings giving rise to these appeals have their roots in the protracted litigation initiated to compel the construction of a public housing project in the Whitman Park section of Philadelphia, Pennsylvania. The turbulent history of that project has been recounted in detail elsewhere and need not be repeated. *See Resident Advisory Board v. Rizzo*, 425

F.Supp. 987 (E.D.Pa.1976), *aff'd in relevant part*, 564 F.2d 126 (3d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978).[1] *See also Sworob v. Harris*, 451 F.Supp. 96 (E.D.Pa.1978), *aff'd*, 3 Cir., 578 F.2d 1376, *cert. denied*, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979). In brief, however, the project envisions the construction of low-rise townhouses of public housing for low-income tenants in an area of the city where the vast majority of the residents are white. The project, which has been planned in some form since 1956, has faced strong opposition from area residents and, through much of its history, from the city government itself. Construction is still in progress.

In 1971, in response to the various delays in the project, a class of plaintiffs, made up of low-income minority persons, who were unable to secure adequate housing outside of areas of minority concentration, and two organizations whose memberships included similarly situated public housing tenants, filed a civil action against a number of defendants arguably responsible for the construction of the project. After certain additional parties were joined during the course of pretrial proceedings, the defendants included the mayor of Philadelphia, the managing director of Philadelphia, the city itself, the builder in charge of the project, the local community group opposed to the project, two municipal housing authorities, and—essential to our decision here—the United States Department of Housing and Urban Development ("HUD").[2] The non-

1. The litigation which gave rise to the cited opinions shall hereinafter be referred to generally as "*RAB v. Rizzo.*"

2. The history of the joinder of the various defendants was set forth in the opinion of the district court in the findings of fact accompanying its decree ordering the construction of the project:

The original defendants who were joined when this suit was filed were the then Mayor James H. J. Tate, the City Managing Director Fred Corleto, Multicon Properties, Inc. and Multicon Construction Corporation, who were to be the builders of the Whitman Park Townhouse Project. The local community group opposing the Whitman project, WAIC,

was permitted, pursuant to their motion, to intervene as a defendant in the lawsuit. WAIC then joined as third party defendants PHA [Philadelphia Housing Authority], RDA [Redevelopment Authority of Philadelphia] and HUD. PHA is created by state statute and is composed of five members, two of whom are chosen by the Mayor of Philadelphia, two by the Controller of the City of Philadelphia, with the four appointed members selecting the fifth. The members serve for staggered five year terms.... RDA is also a creature of state statute and all its members are appointed by the Mayor of Philadelphia.

In 1972, the new Mayor, Frank Rizzo, and the new Managing Director, Hillel Levinson,

jury trial of this underlying civil action consumed 57 days. At its conclusion, the district court held that the governmental defendants had violated statutory obligations to take affirmative steps to promote integration in public housing; had unlawfully taken actions in regard to the Whitman Park project which had a racially discriminatory effect without a compelling justification; and, in the case of the City of Philadelphia, had unlawfully taken racially discriminatory actions *with* a racially discriminatory purpose.[3] The Court, therefore, issued an order directing the various governmental defendants to "take all necessary steps for the construction of the Whitman Park Townhouse Project as planned." 425 F.Supp. at 1029. Of particular importance here, the Court specifically found that *HUD had violated its affirmative duty to promote public housing imposed by Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3608(d)(5)*, 425 F.Supp. at 1021, which finding was not appealed by HUD. *See Resident Advisory Board v. Rizzo*, 564 F.2d at 139–140.

Despite the court's order, which was affirmed in all pertinent respects, *see id.* at 153, area residents continued to resist the construction of the project. On March 14, 1980, upon the motion of plaintiffs in *RAB v. Rizzo*, the district court entered a temporary restraining order to be effective March 17, 1980, barring the area residents ("Whitman Council") from interfering with the construction of the townhouses, which was scheduled to begin March 18, 1980. Plaintiffs also moved for a preliminary and permanent injunction. The court held three

days of hearings, during which the Court granted the motion of A&R Development, Inc., the project developer, and Jolly Construction Co., the general contractor, to intervene as parties plaintiff. "The intervenors, *along with HUD, joined* plaintiffs' motion for preliminary and permanent injunction." *Resident Advisory Board v. Rizzo, supra*, 503 F.Supp. at 385 (emphasis added). The court thereafter entered the preliminary injunction, which was allegedly violated by the four defendants now appealing to this Court.

In pertinent part, the order enjoined the Whitman Council, its members and officers, and all those acting in concert with them, from "[p]icketing, protesting, rallying, demonstrating or similarly assembling in the Whitman Construction Site Area," which was defined by a dotted line drawn on a map of the area attached to the order. As an exception to the general prohibition, however, the order provided that one informational picket could stand at each of the ten gates to the construction site; further picketing was also permitted within a barricaded sidewalk area along one block across the street from the construction site. The order permitted the informational pickets to peacefully converse with persons entering or leaving the job site, but provided that such conversations were to be limited to 60 seconds in duration and also prohibited the informational pickets from obstructing access to the job site. In nine additional paragraphs, the injunction prohibited, in detail, other acts of direct interference with the construction of the project.[4] Finally,

were joined individually as defendants and were substituted in their official capacities for their predecessors in office, Mayor Tate and Managing Director Corleto. The City of Philadelphia was later added as a defendant, as was RDA. Finally, after extensive discovery had been conducted, PHA and HUD were joined by the plaintiffs as defendants. The Philadelphia City Council was joined as a defendant in the event the Council was needed to insure that the Court could render appropriate relief.
425 F.Supp. at 992–993 (footnotes omitted).

**3.** On appeal, the grounds upon which the governmental defendants, other than HUD, were

held liable were modified, but all were held to be liable on some ground and thereby subject to the district court's order directing the completion of the project. *See Resident Advisory Board v. Rizzo, supra*, 564 F.2d at 140–150. Since the grounds upon which the governmental defendants were held liable are of no importance to the issues presently on appeal, we will not state them here.

**4.** The nine remaining paragraphs prohibiting interference with the project provided as follows:

2. Obstructing, impeding, hindering, delaying, interrupting or blocking any street, passageway or access route in or to the

the order provided for the United States Marshal or his deputies to assist in the enforcement of the order.

On the morning of June 3, 1980, a crowd of area residents gathered in front of the two eastern gates to the job site, barring access to the site. The United States Marshal, using a bullhorn, announced that the crowd was obstructing access to the site in violation of the district court's injunction, and that those who did not disperse would be arrested. A little more than five minutes later, the Philadelphia Police backed emergency wagons into the area and began arresting people. Among those arrested were the four defendants here.

Defendants were charged with criminal contempt under 18 U.S.C. § 401 for violating the injunction prohibiting interference with the construction of the project. On June 27, 1980, the district court from which the injunction had issued referred the cases for trial by the magistrate pursuant to 18 U.S.C. § 3401, "provided that the potential penalties for such contempts do not exceed misdemeanors, as defined in 18 U.S.C. § 1." The Government also moved to limit sentence to six months' imprisonment, a $5,000 fine or five years' probation, and this motion was granted. Defendants pleaded not guilty and signed forms consenting to trial before the magistrate. Defendants crossed

out, however, that part of the consent form which states that any right to a jury trial is waived. On July 10, defendants moved for a jury trial or for recusal of the magistrate assigned to try the case. Both motions were denied, and defendants were tried without a jury. Each was found guilty and sentenced to a period of probation. These appeals followed.

## II. *Subject Matter Jurisdiction*

■ Defendants first contend that the magistrate lacked subject matter jurisdiction to try the defendants for contempt upon referral from the district court, even under the recently amended language of 18 U.S.C. § 3401. *See* Federal Magistrate Act of 1979, Pub.L.No. 82, 96th Cong., 1st Sess., 93 Stat. 643 (1979) (amending 18 U.S.C. § 3401). Section 3401 now provides:

(a) When specially designated to exercise such jurisdiction by the district court or courts he serves, any United States magistrate shall have jurisdiction to try persons accused of, and sentence persons convicted of, misdemeanors committed within that judicial district.

Congress, however, has not placed any specific limits on the penalties courts may impose upon persons convicted of criminal contempt. Nevertheless, the Supreme

Whitman Construction Site Area, or attempting or threatening any such actions.

3. Causing any damage or other harm to persons, property or materials in any manner connected with construction at the Whitman Park Site, or attempting or threatening to cause any such damage or harm.

4. Entering the construction site (designated by shaded area marked "Whitman Park" on the attached plan) without the express permission of the person in charge of the construction of the Whitman Park townhouses or of the United States Marshal, or his Deputy at the Site.

5. Preventing or attempting to prevent by physical violence or force, intimidation, coercion, threats or any other means, any person or vehicle having lawful business with A&R Development or Jolly Co. from freely entering or leaving the Whitman Construction Site Area.

6. Using any means to coerce, threaten or intimidate or to attempt to coerce, threaten or intimidate A&R Development or Jolly Co.

or their employees, or others having lawful business upon the Whitman Construction Site, from going upon or leaving such Site or doing business with them.

7. Preventing or attempting to prevent by physical obstruction, violence, intimidation, coercion, or threats thereof, or any other means, deliveries and shipments of materials intended for use at the Whitman Construction Site at any location.

8. Engaging in physical obstruction, violence, intimidation or coercion, or threats thereof, directed towards A&R Development, Jolly Co. or their subcontractors or their employees.

9. Seizing, restraining, or damaging any personal or real property of A&R Development or Jolly Co. or any of their subcontractors or employees.

10. Encouraging or inducting [*sic*] others to engage in any of the aforesaid activities. *Resident Advisory Board v. Rizzo, supra,* 503 F.Supp. at 390–391.

Court has held that "in prosecutions for criminal contempt where no maximum penalty is authorized, the severity of the penalty actually imposed is the best indication of the seriousness of the particular offense." *Frank v. United States*, 395 U.S. 147, 149, 89 S.Ct. 1503, 1505, 23 L.Ed.2d 162 (1969). *See also Codispoti v. Pennsylvania*, 418 U.S. 506, 511, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974); *Taylor v. Hayes*, 418 U.S. 488, 495, 94 S.Ct. 2697, 2701, 41 L.Ed.2d 897 (1974). On this reasoning, the Supreme Court has held that whether the Sixth Amendment to the Constitution entitles a person charged with criminal contempt to a trial by jury depends on the severity of the penalty actually imposed. *See Codispoti v. Pennsylvania, supra; Taylor v. Hayes, supra; Frank v. United States, supra; Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968); *Cheff v. Schnackenberg*, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966). Although the defendants contend that this analysis is "unworkable and inappropriate" for purposes of deciding whether a case of criminal contempt is triable by a magistrate under 18 U.S.C. § 3401, the Court sees no reason why the analysis should not be employed. In both situations, the court is seeking to determine whether a particular case of criminal contempt warrants the attachment of an important procedural right. If the Supreme Court has determined that the penalty imposed for the offense is a sufficiently accurate measure of the severity of the offense for the purpose of determining whether a person charged with criminal contempt is entitled to a trial by jury, it should be an equally accurate measure for the purpose of determining whether a case of criminal contempt is triable before a magistrate.

The statute itself buttresses our conclusion. Under § 3401, the grade of the offense determines whether a criminal case may be referred to a magistrate. Since the grade of the offense is gauged by the severity of the punishment it carries, it follows that Congress considered the severity of the punishment to be the relevant measure of the seriousness of an offense for purposes of determining whether a criminal case is triable before a magistrate.

■ Defendants argue, however, that 28 U.S.C. § 636(e) prohibits magistrates from trying contempts. Section 636(e) provides that "[i]n any proceeding before a magistrate," certain enumerated acts, including disobedience of any lawful order, "shall constitute a contempt of the district court for the district wherein the magistrate is sitting." The section then goes on to say:

Upon the commission of any such act or conduct, the magistrate shall forthwith certify the facts to a judge of the district court and may serve or cause to be served upon any person whose behavior is brought into question under this section an order requiring such person to appear before a judge of that court upon a day certain to show cause why he should not be adjudged in contempt by reason of the facts so certified. A judge of the district court shall thereupon, in a summary manner, hear the evidence as to the act or conduct complained of and, if it is such as to warrant punishment, punish such person in the same manner and to the same extent as for a contempt committed before a judge of the court, or commit such person upon the conditions applicable in the case of defiance of the process of the district court or misconduct in the presence of a judge of that court.

28 U.S.C. § 636(e). Defendants contend that this provision and its legislative history reflect the intent of Congress not to permit magistrates to try contempts.

Defendants are clearly mistaken. By its own terms, § 636(e) merely prohibits magistrates from trying contempts committed in their own proceedings and requires that such cases be certified to the district court for trial. This limited congressional objective is reflected in the Senate report accompanying the Senate bill which contained § 636(e):

Proposed 28 U.S.C. 636 [(e)] provides that specified acts or conduct before a magistrate shall constitute contempt of the U.S. District Court for the district in which the magistrate is sitting. S.3475,

the predecessor of S.945 [the bill containing the provision now found at 28 U.S.C. § 636(e)], listed the same acts specified as contemptuous in S.945, but would have permitted the U.S. magistrate himself to punish such acts when committed in his presence as contempts of court. The Committee on the Administration of Criminal Law of the Judicial Conference of the United States expressed "serious doubts about the present provisions of section 636 [(e)] [of S.3475] as presently worded which would give a full-time or part-time magistrate the power to try and punish contempts." The committee recommended a substantial change in the language of S.3475, to make "any act committed *in any proceeding before a magistrate* * * * which if committed under existing or subsequently enacted statutes in a district would constitute contempt of such district court" a contempt of that court, and to allow the magistrate to certify the facts of such act of conduct to the district court for appropriate action by that court.

S.945 adopts the substance, if not the language, of the Committee on the Administration of Criminal Law's suggestion. Thus, the commission of the specified acts or conduct *before the magistrate* constitutes a contempt of the district court which he serves, and the magistrate *before whom any such act or conduct takes place* is required to forthwith certify the facts to the district court.

\* \* \* \* \* \*

Your committee is satisfied that the procedure for handling alleged contempts specified in this section is adequate both to insure proper respect for the office of U.S. magistrate and its process, and to protect the rights of alleged contemnors . . . .

S.Rep.No. 371, 90th Cong., 1st Sess. 27 (1967) (emphasis added). Thus, in proceedings presided over by magistrates, the magistrates are not empowered to define, in the first instance, what conduct constitutes contempt, that responsibility being left to the district court. However, once the district court has entered an order prohibiting certain conduct, thus defining what conduct constitutes contempt, nothing in § 636(e) prohibits a magistrate from determining whether a person accused of having engaged in such conduct has, in fact, done so.[5]

■ For these reasons, the Court concludes that the magistrate had the power to try these defendants under § 3401.

### III. *Statutory Right to a Jury Trial*

Defendants next contend that they were denied a statutory right to a jury trial in the magistrate's court and point to two statutory bases for such a right.[6] First, defendants contend that the contempts charged constitute criminal offenses under Pennsylvania law, thus giving rise to a right to a jury trial under 18 U.S.C. §§ 402 and 3691. In the alternative, defendants argue that the contempts charged consist of acts in violation of an injunction issued, at least in part, under the Civil Rights Act of 1964, thus giving rise to a right to a jury trial under 42 U.S.C. § 2000h. The Court now turns to these claims.

### (A) *Jury Trial Under 18 U.S.C. §§ 402 and 3691*

■ Defendants here were charged under the current provision of the United States Code, entitled "CHAPTER 21—CONTEMPTS," defining, in two sections only, the crime of criminal contempt. The first of those two sections, 18 U.S.C. § 401,

---

**5.** The House report simply does not address the question whether magistrates should be empowered to try contempts. *See* H.R.Rep.No. 1629, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad.News 4252.

**6.** Since the punishment to be imposed upon the defendants was limited at the outset of the cases to a maximum of six months' imprison-

ment, defendants are not entitled to a jury trial under the Sixth Amendment to the Constitution. *See Muniz v. Hoffman,* 422 U.S. 454, 475–476, 95 S.Ct. 2178, 2190, 45 L.Ed.2d 319 (1975); *Taylor v. Hayes, supra,* 418 U.S. at 496, 94 S.Ct. at 2702; *Bloom v. Illinois, supra,* 391 U.S. at 201–202, 210, 88 S.Ct. at 1481–1482, 1486.

provides in pertinent part that "[a] court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—* * * (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command." Generally speaking, a person charged with criminal contempt is not entitled to a jury trial as long as the punishment imposed does not exceed that imposed for petty offenses. *See Muniz v. Hoffman,* 422 U.S. 454, 475–476, 95 S.Ct. 2178, 2190, 45 L.Ed.2d 319 (1975); *Taylor v. Hayes, supra* 418 U.S. at 496, 94 S.Ct. at 2702; *Bloom v. Illinois, supra,* 391 U.S. at 201–202, 210, 88 S.Ct. at 1481–1482, 1486; *Cheff v. Schnackenberg, supra,* 384 U.S. at 380, 86 S.Ct. at 1526. However, the second section of Chapter 21, 18 U.S.C. § 402, provides as follows:

> Any person . . . willfully disobeying any lawful writ, process, order, rule, decree, or command of any district court of the United States . . . by doing any act or thing therein, or thereby forbidden, *if the act or thing so done be of such character as to constitute also a criminal offense* under any statute of the United States *or under the laws of any State* in which the act was committed, shall be prosecuted for such contempt as provided in section 3691 of this title [Title 18] and shall be punished by fine or imprisonment, or both.

18 U.S.C. § 402 (emphasis added). Section 3691, in turn, referred to in § 402, provides:

> Whenever a contempt charged shall consist in willful disobedience of any lawful writ, process, order, rule, decree, or command of any district court of the United States by doing any act or thing in violation thereof, and the act or thing done or omitted also constitutes a criminal offense under any Act of Congress, or under the laws of any state in which it

was done or omitted, the accused, upon demand therefor, shall be entitled to trial by a jury, which shall conform as near as may be to the practice in other criminal cases.

18 U.S.C. § 3691. Thus, read together, §§ 402 and 3691 modify § 401 by creating a right to a jury trial in favor of a person charged with criminal contempt of a court order, where the conduct constituting the contempt charged also happens to constitute a federal or state criminal offense.

That the sections *must* be read together is apparent from a study of the legislative history and purpose of §§ 402 and 3691. As will be discussed in greater detail below, §§ 402 and 3691 were intended to end an abuse of the contempt power in which, in some circumstances, persons were prosecuted for contempt of injunctions instead of for violations of criminal laws stemming from the same conduct and were thus deprived of their right to trial by jury.[7] If the Court were to treat §§ 401 and 402 separately, as if they defined separate offenses, the Government could avoid having to deal with the vital protections accorded by §§ 402 and 3691 simply by typing in the indictment that the accused is charged only with a violation of "§ 401." A more sensible construction is that, where the person is charged with criminal contempt only under § 401, but in fact the contempt charged consists of conduct which *also* violates state or federal criminal law, the provisions of §§ 402 and 3691 automatically come into play. That consequence should not depend solely on the choice by the draftsman not to mention § 402.

The statutory right to a jury trial conferred by §§ 402 and 3691 is, nevertheless, subject to two exceptions:

> This section shall not be construed to relate to contempts committed in the

---

**7.** Prior to the decision of the Supreme Court in *Bloom v. Illinois, supra,* in which the Court held that the Sixth Amendment right to trial by jury in criminal cases obtains in cases of criminal contempt where the punishment imposed exceeds that imposed for "petty" offenses, *id.,* 391 U.S. at 201–202, 210, 88 S.Ct. at 1481–1482, 1486, it was generally held that the right

to trial by jury simply did not obtain at all in cases of criminal contempt. *See, e. g., Green v. United States,* 356 U.S. 165, 183–187, 78 S.Ct. 632, 642–645, 2 L.Ed.2d 672 (1958). Thus, when §§ 402 and 3691 were originally enacted in 1914, *see infra,* the possibility for abuse of the contempt power was far greater than it is today.

presence of the court, or so near thereto as to obstruct the administration of justice, *nor to contempts committed in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States,* but the same, and all other cases of contempt not specifically embraced in this section may be punished in conformity to the prevailing usages at law.

18 U.S.C. § 402. *See also id.* § 3691. Thus, even where the contempt charged does consist of conduct constituting a crime under either federal or state law, the accused is not entitled to a trial by jury if the order allegedly violated was entered in a suit brought "in the name of, or on behalf of, the United States." It is in respect to the applicability of this exception that the present appeal is concerned.

The Government does not dispute defendants' contention that the alleged conduct of the defendants is "of such character as to constitute also a criminal offense under . . . the laws of [the] State in which the act was committed." Specifically, defendants argue, without opposition, that defendants' alleged conduct, if proven, would constitute a violation of 18 Pa.Cons.Stat.Ann. § 5507, Pennsylvania's statute defining the criminal offense of disorderly conduct.[8] The parties also agree that, even though the defendants were charged with criminal contempt under § 401 alone, the provisions of §§ 402 and 3691 nevertheless apply simply because the alleged conduct constituting the contempt would also constitute the criminal offense of disorderly conduct under Pennsylvania law.

The parties disagree, however, over the applicability of the exception to § 402's statutory right to a jury trial eliminating that right where the contempt charged consists of disobedience of an order entered in a suit or action "brought or prosecuted in the name of, or on behalf of, the United States." The injunction allegedly violated by the defendants was entered in *Resident Advisory Board v. Rizzo, supra,* 503 F.Supp. 383, litigation originally instituted by private parties: a class of public housing tenants and those on the waiting list for public housing, and two organizations consisting of members with like interests in public housing. The agency of the federal government involved in the action, HUD, was named as one of the defendants. Defendants argue that "the plain unambiguous meaning of the relevant statutory language is that the right to a jury trial is lost only when the United States is a party plaintiff." Defendants' Joint Brief, at 12. Defendants contend that this interpretation is also clear from the legislative history of §§ 402 and 3691. Since the injunction allegedly violated by the defendants was entered in an action brought by a private party rather than by the Government, and the Government was in fact a named *defendant,* the defendants conclude that the

---

**8.** 18 Pa.Cons.Stat.Ann. § 5507 (Purdon 1973) provides as follows:

(a) *Obstructing.*—A person, who, having no legal privilege to do so, intentionally or recklessly obstructs any highway, railroad track or public utility right-of-way, sidewalk, navigable waters, other public passage, whether alone or with others, commits a summary offense, or, in case he persists after warning by a law officer, a misdemeanor of the third degree. No person shall be deemed guilty of an offense under this subsection solely because of a gathering of persons to hear him speak or otherwise communicate, or solely because of being a member of such a gathering.

(b) *Refusal to move on.*—

(1) A person in a gathering commits a summary offense if he refuses to obey a reasonable official request or order to move:

(i) to prevent obstruction of a highway or other public passage; or

(ii) to maintain public safety by dispersing those gathered in dangerous proximity to a fire or other hazard.

(2) An order to move, addressed to a person whose speech or other lawful behavior attracts an obstructing audience, shall not be deemed reasonable if the obstruction can be readily remedied by police control of the size or location of the gathering.

(c) *Definition.*—As used in this section the word "obstructs" means renders impassable without unreasonable inconvenience or hazard.

*Id.*

exception for criminal contempts of orders entered in suits brought "in the name of, or on behalf of, the United States" does not apply and that §§ 402 and 3691, therefore, entitled defendants to a jury trial.

The Government, on the other hand, points out that the order allegedly violated by the defendants was entered in response to a motion for a preliminary injunction made by the plaintiff-tenants and the plaintiff-intervenor-developer *and was joined in* by the Government. The Government also states that "HUD's consistent position, throughout the approximately nine years of the *RAB v. Rizzo* litigation, has been that the Whitman project should be built," Government's Brief, at 8, and notes those docket entries which reflect the Government's efforts to have the project constructed. The Government then argues that "its motion for an order limiting picketing at the site, when considered in the context of the underlying *RAB v. Rizzo* litigation, was the *functional equivalent* of a 'suit or action brought or prosecuted in the name of, or on behalf of, the United States' within the meaning of 18 U.S.C. §§ 402 and 3691." Government's Brief, at 10 (emphasis added). The Government argues that "to accept the defendants' argument would be to denigrate substance in favor of form," and proposes that the test for determining whether the exception applies should be "whether or not the government is attempting to vindicate significant federal and public interests by means of an application to a federal court." *Id.* at 10–11.

A literal reading of the language of §§ 402 and 3691 supports the defendants' position. The language of the statutory exception states that the underlying action must have been "brought or prosecuted in the name of, or on behalf of, the United States"; *RAB v. Rizzo* simply was not. The Government argues, however, with persuasive force, that the exception should be broadly construed to encompass contempts of orders issued in response to any attempt by the Government "to vindicate significant federal and public interests by means of an application to a federal court." Govern-

ment's Brief, at 11. Therefore, the Court must turn to the case law and legislative history of §§ 402 and 3691 to determine whether the Government's broader construction of the statute was intended.

The scant case law interpreting or applying §§ 402 and 3691 is not very helpful. In all but one of the cases found, either it was clear that the Government had brought the action in which the injunction was entered, *see Frank v. United States*, 395 U.S. 147, 149 n.1, 89 S.Ct. 1503, 1505, 23 L.Ed.2d 162 (1969); *Hill v. United States ex rel. Weiner*, 300 U.S. 105, 108, 57 S.Ct. 347, 349, 81 L.Ed. 537 (1937); *United States v. Bialkin*, 331 F.2d 956, 958 n.1 (2d Cir. 1964); *James v. United States*, 275 F.2d 332, 336 (8th Cir. 1960); or it was clear that it had not. *See Clark v. Boynton*, 362 F.2d 992, 996–999 (5th Cir. 1966). Of the reported cases found, only *United States v. Barnett*, 330 F.2d 369 (5th Cir. 1963), *certified question answered in the negative*, 376 U.S. 681, 84 S.Ct. 984, 12 L.Ed.2d 23 (1964), discusses the applicability of the exception to §§ 402 and 3691 to a case which the United States did not initiate. Although the facts in *Barnett* and the litigation leading to it are quite complex, the Court concludes that the salient facts of the case distinguish it from the case under consideration on this appeal.

*Barnett* grew out of the litigation instituted in the effort to permit James Meredith to attend the University of Mississippi. *See Meredith v. Fair*, 313 F.2d 534 (5th Cir. 1962); *Meredith v. Fair*, 305 F.2d 341, 305 F.2d 343, 306 F.2d 374 (5th Cir.), *cert. denied*, 371 U.S. 828, 83 S.Ct. 49, 9 L.Ed.2d 66 (1962). Meredith sought admission to the University in 1961 and, upon refusal, filed suit in federal district court seeking injunctive relief to compel the University to admit him. The district court denied relief, but the court of appeals reversed and directed the district court to grant the relief prayed for. The court of appeals subsequently recalled its mandate and reissued it, this time including its own injunctive order compelling the University to admit Meredith. Thereafter, the court of appeals also granted the application of the United

States for permission to appear in the case, using the following language:

> IT IS ORDERED that the United States be designated and authorized to appear and participate as *amicus curiae* in all proceedings in this action before this Court and by reason of the mandates and orders of this Court of July 27, 28, 1962, and subsequently thereto, also before the District Court for the Southern District of Mississippi to accord each court the benefit of its views and recommendations, with the right to submit pleadings, evidence, arguments and briefs and to initiate such further proceedings, including proceedings for injunctive relief and proceedings for contempt of court, as may be appropriate in order to maintain and preserve the due administration of justice and the integrity of the judicial processes of the United States.

*United States v. Barnett*, 376 U.S. at 683–684, 84 S.Ct. at 986. Resistance to the order of the court of appeals continued, however, on the part of the university officials and the state government, including the governor and the lieutenant governor. The United States, acting pursuant to the authority specially conferred by the court of appeals, applied for a temporary restraining order against the governor, Ross R. Barnett, and various other state officials, to enjoin them from further actions preventing the fulfillment of the court's order directing the admission of Meredith. Later, in November of 1962, the court of appeals, *sua sponte*, appointed the United States Attorney General or his designated assistants to prosecute Governor Barnett and Mississippi's lieutenant governor for criminal contempt for their violations of the orders of the court of appeals. The alleged contemnors were tried without a jury, despite their argument that a jury was required by *inter alia*, §§ 402 and 3691.

On appeal, the court of appeals *en banc* divided evenly on the question whether a jury trial was required, and, therefore, certified the question to the Supreme Court. The opinion of the four judges voting to affirm stated that the defendants were not entitled to a jury trial by §§ 402 and 3691

for two reasons: (1) §§ 402 and 3691 by their own terms confer a right to a trial by jury where the accused is charged with criminal contempt of the order "of any *district* court" and, therefore, do not apply where the order allegedly violated was issued by a court of appeals; and, (2) the orders allegedly violated were entered in a "suit or action brought or prosecuted in the name of, or on behalf of, the United States." 330 F.2d at 388–389. This last reason was based on the plurality's understanding of the order of the court of appeals which permitted the United States to appear and take part in the proceedings. The plurality opinion stated that the order "constituted the United States as something more than a mere *amicus curiae*. Pursuant to that order, the United States was '. . . acting under the authority and direction of the court to take such action as was necessary to prevent its orders and judgments from being frustrated and to represent the public interest in the due administration of justice.'" *Id.* at 388–389, *quoting Faubus v. United States*, 254 F.2d 797, 805 (8th Cir.), *cert. denied*, 358 U.S. 829, 79 L.Ed. 49, 3 L.Ed.2d 68 (1958). The Supreme Court, in answering the certified question in the negative and holding that the defendants were not entitled to trial by jury, found it unnecessary to decide whether the Government's participation in the proceedings leading to the orders allegedly violated was sufficient to render the action one "brought or prosecuted in the name of, or on behalf of, the United States." *See* 376 U.S. at 692 n.8, 84 S.Ct. at 990. Instead, the Supreme Court relied exclusively on the first rationale offered by the Fifth Circuit plurality for denying a jury trial, and held that §§ 402 and 3691 did not apply where the injunction allegedly violated was issued by a court of appeals. *Id.* at 690–692, 84 S.Ct. at 989–990.

For several reasons, however, *Barnett* is of slight value in the resolution of the issue before the Court. First, the role of the Government in *Meredith v. Fair, supra*, was unusual if not unique. In *Barnett*, the court of appeals plurality defending the de-

nial of a jury trial described the role as "something more than a mere *amicus curiae*." 330 F.2d at 388. Indeed, it seems plain that the court of appeals assigned the United States, upon its application, status as a *de facto* party plaintiff. HUD simply did not play a comparable role in the *RAB v. Rizzo* litigation. HUD did not seek to enter the *RAB v. Rizzo* litigation to defend important federal and public interests; it was joined as a defendant.[9] HUD was not charged with the prosecution of the case; that responsibility remained, in principle and in fact, in the hands of the plaintiff class of present and potential public housing tenants and the two tenants' organizations. *See generally Resident Advisory Board v. Rizzo, supra.* HUD did not even initiate the motion for a preliminary injunction in response to which the order allegedly violated by defendants was issued; it merely *joined* the motion which had previously been raised by the Resident Advisory Board and the developer.

Moreover, even if we were to read the opinion of the *Barnett* plurality denying a jury trial to support the Government's position in the instant appeal, the fact remains that that interpretation of §§ 402 and 3691 has never commanded the majority of any court. The Fifth Circuit in *Barnett* divided

evenly, and the Supreme Court never reached the issue. In addition, even the *Barnett* plurality denying a jury trial treated the rationale based on the exception to §§ 402 and 3691 as secondary to its conclusion that §§ 402 and 3691 only apply in cases where the order allegedly violated was issued by a district court. Thus, the plurality's discussion of the exception to §§ 402 and 3691 is mere *dicta*. Finally, the plurality opinion's discussion of the exception to §§ 402 and 3691 offers no authority for its conclusion that the exception should extend to contempts of orders issued in suits not literally "brought or prosecuted in the name of, or on behalf of, the United States." Likewise, the opinion fails to analyze or even mention the legislative history or purpose behind §§ 402 and 3691. For all of these various reasons, the Court is unable to rely on *Barnett* in making its decision.

Since the case law interpreting §§ 402 and 3691 offers little assistance, the Court must turn to the pertinent legislative history. The language now found in §§ 402 and 3691, including the exception at issue here, first appeared in 1912 in a bill introduced in the House of Representatives by Representative Clayton. H.R. 22591, 62d Cong. 2d Sess., 48 Cong.Rec. 4068 (1912).[10] The bill,

---

9. Indeed, portions of the district court's opinion in *RAB v. Rizzo* appear to refute the Government's assertions that "HUD's consistent position, throughout the approximately nine years of the *RAB v. Rizzo* litigation, has been that the Whitman project should be built." Government's Brief at 8. For example, on July 5, 1972, the Mayor of Philadelphia, Frank L. Rizzo, wrote to an assistant to the President complaining of sanctions threatened by HUD against the city. The district court, in its findings of fact, then stated that "[s]hortly thereafter, HUD's general counsel, David Maxwell, Esquire, gave instructions by telephone to HUD Regional Director Theodore Robb to keep a 'low profile' in the Whitman controversy." *Resident Advisory Board v. Rizzo, supra*, 425 F.Supp. at 1005. *See also id.* at 1002–1003 (in April and May of 1972, HUD declined the original developer's request that HUD exert pressure on Philadelphia in connection with the building of the Whitman project for political reasons).

10. H.R. 22591, in its entirety, reads as follows:
*Be it enacted, etc.,* That the act entitled "An act to codify, revise, and amend the laws

relating to the judiciary," approved March 3, 1911, be and the same is hereby, amended by inserting after section 268 thereof five new sections, to be numbered, respectively, 268a, 268b, 268c, 268d, and 268e, reading as follows:
"Sec. 268a. That any person who shall willfully disobey any lawful writ, process, order, rule, decree, or command of any district court of the United States by doing any act or thing therein or thereby forbidden to be done by him, if the act or thing so done by him be of such character as to constitute also a criminal offense under any statute of the United States or at common law shall be proceeded against for his said contempt as hereinafter provided.
"Sec. 268b. That whenever it shall be made to appear to any district court or judge thereof, or to any judge therein sitting, by the return of a proper officer on lawful process, or upon the affidavit of some credible person, or by information filed by any district attorney, that there is reasonable ground to believe that any person has been guilty of such contempt, the court or judge thereof, or any

which was devoted exclusively to the matters now covered in §§ 402 and 3691, was passed by the House after considerable debate. *See* 48 Cong.Rec. 8808–8809 (1912). When the bill reached the Senate, it was referred to the Senate Committee on the Judiciary, 48 Cong.Rec. 8993, but was never reported out.

Two years later, provisions identical to the provisions of H.R. 22591 comprised five sections of the bill which, when enacted, became known as the Clayton Act. H.R. 15657, 63d Cong., 2d Sess., §§ 19–23, 51 Cong.Rec. 13660–13661 (1914), *enacted as*

Act of Oct. 15, 1914, ch. 323, §§ 21–25, 38 Stat. 730 ("Clayton Act"). The House debates on the Clayton Act did not touch upon the provisions relevant in this appeal, but the Senate addressed them at some length. *See infra.* These provisions, comprising §§ 21–25 of the Clayton Act, as finally enacted, were later codified, without substantial change, at 28 U.S.C. §§ 386–390. *See* 28 U.S.C. §§ 386–390 (1926). In 1948, the provisions were reworded and recodified as §§ 402 and 3691 of the newly created Title 18 of the United States Code. *See* Act of June 25, 1948, ch. 645, §§ 402, 3691,

judge therein sitting, may issue a rule requiring the said person so charged to show cause upon a day certain why he should not be punished therefor, which rule, together with a copy of the affidavit or information, shall be served upon the person charged with sufficient promptness to enable him to prepare for and make return to the order at the time fixed therein. If upon or by such return, in the judgment of the court, the alleged contempt be not sufficiently purged, a trial shall be directed at a time and place fixed by the court; *Provided, however,* That if the accused, being a natural person, fail or refuse to make return to the rule to show cause, an attachment may issue against his person to compel an answer, and in the case of his continued failure or refusal, or for any reason it be impracticable to dispose of the matter on the return day, he may be required to give reasonable bail for his attendance at the trial and his submission to the final judgment of the court. *Where the accused person is a body corporate, an attachment for the sequestration of its property may be issued upon the refusal or failure to answer.*

"In all cases within the purview of this act such trial may be by the court, or upon demand of the accused, by a jury; in which latter event the court may impanel a jury from the jurors then in attendance, or the court or the judge thereof in chambers may cause a sufficient number of jurors to be selected and summoned, as provided by law, to attend at the time and place of trial, at which time a jury shall be selected and impaneled as upon a trial for misdemeanor; and such trial shall conform, as near as may be, to the practice in criminal cases prosecuted by indictment or upon information.

"If the accused be found guilty, judgment shall be entered accordingly, prescribing the punishment, either by fine or imprisonment, or both, in the discretion of the court. Such fine shall be paid to the United States or to the complainant or other party injured by the act constituting the contempt, or may, where more than one is so damaged, be divided or apportioned among them, as the court may direct; but in no case shall the fine to be paid to the United States exceed, in case the accused is a natural person, the sum of $1,000, nor shall such imprisonment exceed the term of six months.

"Sec. 268c. That the evidence taken upon the trial of any person so accused may be preserved by bill of exceptions, and any judgment of conviction may be reviewed upon writ of error in all respects as now provided by law in criminal cases, and may be affirmed, reversed, or modified as justice may require. Upon the granting of such writ of error execution of the judgment shall be stayed, and the accused, if thereby sentenced to imprisonment, shall be admitted to bail in such reasonable sum as may be required by the court or by any justice or any judge of any district court of the United States.

"Sec. 268d. That nothing contained herein shall be construed to relate to contempts committed in the presence of the court, or so near thereto as to obstruct the administration of justice, nor to contempts committed in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action brought or prosecuted in the name of or on behalf of the United States, but the same and all other cases of contempt not specifically embraced within section 268a of this act may be punished in conformity to the usages at law and in equity now prevailing.

"Sec. 268e. That no proceeding for contempt shall be initiated against any person unless begun within one year from the date of the act complained of; nor shall any such proceeding be a bar to any criminal prosecution for the same act or acts; but nothing herein contained shall affect any proceedings in contempt pending at the time of the passage of this act."

H.R. 22591, 62d Cong., 2d Sess., 48 Cong.Rec. 8720 (1912).

62 Stat. 681.[11] The text has not been changed since.

Before turning to the details of the legislative history, the Court acknowledges that nothing in the legislative history explains with perfect clarity the exception to §§ 402 and 3691 at issue here. Nevertheless, the Court is convinced that what faint light there is shows that a jury trial is indeed required in these circumstances.

Since the bill introduced by Representative Clayton in 1912, H.R. 22591, was identical to those provisions of the Clayton Act later codified as 18 U.S.C. §§ 402 and 3691, the House debates on H.R. 22591 are relevant here. In particular, the Court emphasizes that H.R. 22591, like §§ 21–25 of the Clayton Act now codified at 18 U.S.C. §§ 402 and 3691, provided for a right to trial by jury in cases of criminal contempt if the acts constituting the contempt charged also constituted a federal or common law criminal offense, *except* where the contempt was committed "in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action *brought or prosecuted in the name of or on behalf of the United States.*" H.R. 22591, 62d Cong., 2d Sess., § 268d, 48 Cong. Rec. 8720 (1912) (emphasis added). *See* note 10 *supra*.

H.R. 22591 embodied a general principle intended for a specific purpose. Until only recently, a person charged with criminal contempt was thought to have no right to a trial by jury. *See, e. g., Green v. United States, supra.* If an injunction were obtained proscribing conduct also proscribed by criminal law, a person accused of such conduct could be subjected to criminal prosecution without the benefit of a jury trial by charging him or her with criminal contempt instead of the applicable criminal offense. The proponents of H.R. 22591 considered this to be wrong, and sought to correct it with the bill they proposed.[12]

The principle objective of the bill, however, was to curb the abuse of the criminal contempt power in labor disputes. In such cases, corporations were seeking and obtaining federal court injunctions prohibiting acts which interfered with the conduct of the business and which occurred in the course of union activity. The corporations would then cause employees participating in such activity to be prosecuted for criminal contempt of the injunction instead of for violation of criminal laws, even in those cases where the union activity also constituted a criminal offense such as disorderly conduct. The result was that many employees participating in strikes or similar conduct were summarily tried and punished without a jury trial for criminal conduct. As stated by one of the bill's advocates: "The purpose of this bill is to prevent injustice in certain classes of cases which chiefly grow out of labor disputes, where great and powerful corporations, on the one hand, go into the Federal courts and seek to enforce their decrees and judgments against laboring people." 48 Cong.Rec. 8779–8880 (remarks of Rep. Floyd).

The rationale and scope of the exception for criminal contempts of orders entered in suits "brought or prosecuted in the name of, or on behalf of, the United States" is less clear. Early in the debates in the House on H.R. 22591, Representative Clayton explained the exception by comparing H.R. 22591 to a previous bill which had also attempted to provide for jury trials in cases of some criminal contempts arising out of labor disputes, but which had succumbed to criticism and had failed to pass:

The next objection that was made to [the previous bill] was that it would probably detract from the power of the courts to enforce their decrees of dissolution of

11. It has not been suggested that the rewording and recodification of these provisions wrought any substantive change in the meaning of the provisions for the purposes of this appeal.

12. This general concern of the proponents of H.R. 22591 is most clearly reflected in the de-

bates in the following rhetorical question posed by Representative Clayton, the bill's sponsor:

Shall the citizen be deprived of his customary jury trial in a case criminal in nature and have substituted for the verdict of 12 of his peers the opinion of one judge?
48 Cong.Rec. 8778 (remarks of Rep. Clayton).

combinations denounced by the anti-trust law. I violate no confidence when I say that that was the criticism of the chief legal officer of the present administration, Attorney General Wickersham. We have met that objection by providing in this bill that it shall not apply in any case where the United States is *the party complainant.* Every man in this House knows that in all proceedings under the Sherman anti-trust law the United States is necessarily, by the terms of the statute, *the party complainant.* So we answered that criticism in this bill.

48 Cong.Rec. 8778 (remarks of Rep. Clayton) (emphasis added). The words emphasized suggest that at least the bill's sponsor intended to except only those cases in which the United States had *initiated* the actions in which the order allegedly violated had been entered.

Later in the House debates, several representatives exchanged views on how the exception would apply in a hypothetical case proposed by Representative Longworth, who eventually voted for the bill. The answers were provided primarily by Representatives Sterling and Mann, the two Congressmen who led the opposition to the bill.

MR. LONGWORTH. Mr. Speaker, the gentleman will recall that I asked the Chairman of the Committee a short time ago whether this bill would apply in the case of an injunction issued by a United States court to prevent interference with the transmission of mail, and he replied that this bill would not apply in a case of this nature.

MR. STERLING. That would depend entirely on whether the Government was a party to the suit.

MR. LONGWORTH. But suppose the United States court issues an injunction to prevent interference with the free transportation of mail, does that not make the United States Government a party?

MR. STERLING. Assuming that the bill for the injunction was filed by the railroad company that carried the mail, this exception would not apply, because the Government would not be a party to the suit.

MR. LONGWORTH. The gentleman means that if the railroad company applied for the injunction it would not apply?

MR. STERLING. Yes; that is correct.

MR. LONGWORTH. Does the gentleman from Alabama [Mr. Clayton] agree to that?

MR. CLAYTON. Mr. Speaker, except by permission of the gentleman from Illinois I could not undertake to answer the question.

MR. STERLING. Oh, I will yield briefly to the gentleman.

MR. CLAYTON. I would like to know whether or not he would want me to give a categorical answer to the proposition?

MR. STERLING. I do not want the gentleman to take up too much of my time.

MR. CLAYTON. I will state, what I said in the beginning, that this bill, wherever the Government of the United States is a party to it, does not have any application, and I adhere to that position. But I say that wherever it is a question between private persons, be they corporations or individuals, this bill has application. I do not know how I can make it any plainer than that.

MR. LONGWORTH. What I am trying to ascertain is when the Government becomes a party.

MR. CLAYTON. Oh, I will state to the gentleman from Wisconsin that I have not the floor and I could not answer a question from which he may desire to put. He seems to have some very acute ideas upon this proposition, and I would like to answer the gentleman if I have the time. In my own time I shall be glad to yield to him.

MR. STERLING. Mr. Speaker, I am sure that in the case the gentleman from Ohio refers to it would not come within the exception.

MR. CANNON. In the *Debs* case the Government did not bring the action.

MR. STERLING. No; the so-called *Debs* case was an ex parte proceeding brought by Debs by way of habeas corpus to be discharged from a commitment for contempt.

MR. MANN. Did the Government not bring the action in that case?

MR. STERLING. It did.

MR. MANN. I think the Government filed a suit at Chicago to prevent interference with the mails.

MR. STERLING. It did; and it was for violation of the injunction in that case that Debs was committed for contempt.

MR. LONGWORTH. But suppose the railroad had originally made the application for the injunction?

MR. MANN. Then it would not.

MR. LONGWORTH. And the courts thereafter granted the injunction.

MR. MANN. It would not come within the exception in the case of an order where the railroad was the complainant, but where the Government of the United States appeared as the complainant, then this would not affect the existing right to trial before the judge.

MR. LONGWORTH. What I am trying to get at is this: if the order issues enjoining interference with the free transportation of mail, does that not of itself make the Government a party to the suit?

MR. MANN. I think not.

MR. LONGWORTH. No matter by whom it is brought.

MR. MANN. Not at all. *It is not a case where the Government is a party to the suit. It is a case where the suit is to be prosecuted by the Government.*

MR. LONGWORTH. 'Brought or prosecuted in the name of or in behalf of.'

MR. MANN. *It does not affect a case where the Government is a party defendant.*

MR. STERLING. *It does not affect any case where the Government is a party. If the railroad should file the bill, it would not come within this exception.* 48 Cong.Rec. 8785–8786 (remarks of Reps. Clayton, Longworth, Mann and Sterling) (emphasis added).

Again, the entire passage does not resoundingly support the conclusion that the exception applies only where the Government is the party complainant. In the first place, the hypothetical proposed by Representative Longworth may have been understood to suggest a case where a private party obtained an injunction merely implicating a federal interest, such as the federal interest in movement of the mails. Such a case would not come within the exception even under the broad interpretation proposed by the Government in this appeal. Moreover, the several references to the United States as a "party" suggest an understanding that the exception would apply whenever the United States was merely a "party," regardless of whether the United States was plaintiff or defendant. Nevertheless, this Court believes the fairest reading of the exchange supports the conclusion that the exception was intended to reach only those cases in which the order allegedly violated was entered in an action in which the United States was the plaintiff or party complainant. Most convincing are the final exchanges, emphasized in the quotation above, in which Representative Mann strongly rejects the suggestion that the exception would apply in a case where the Government was not the plaintiff or party complainant: "It is not a case where the Government is a *party* to the suit. It is a case where the suit is to be *prosecuted* by the Government. . . . It does *not* affect a case where the Government is a *party defendant*." 48 Cong.Rec. 8786 (remarks of Rep. Mann) (emphasis added). The earlier ambiguous references to the United States as a "party" are best interpreted to have been casual remarks made before it became clear to those debating that Representative Longworth wanted to learn precisely how the United States had to be involved in an action before criminal contempts of orders issued in that action could be tried without a jury.

Nothing else contained in the House debates on H.R. 22591 is very helpful, and the House did not return to the exception again

when, two years later, the identical provisions were included in the bill which was to become the Clayton Act. The Senate, however, did take up the exception in the course of its debates on the Clayton antitrust bill. Although the Senate never discussed how the bill might apply in situations where the Government was a party other than the plaintiff or party complainant, the Senate did discuss the purpose and effect of the exception in terms which shed light on the issue on appeal.

In his explanation of the provisions of H.R. 22591 two years before, Representative Clayton had stated that the exception for criminal contempt of orders entered in actions brought by the United States was included in that bill in answer to the criticism that jury trials in cases of criminal contempt would "detract from the power of the courts to enforce their decrees of dissolution of combinations denounced by the anti-trust law." *See* 48 Cong.Rec. 8778 (remarks of Rep. Clayton), *quoted supra.* At the time of those debates, of course, the only antitrust law on the books was the Sherman Act, 15 U.S.C. §§ 1–7 (originally enacted as Act of July 2, 1890, ch. 647, 26 Stat. 209). Faced with the prospect of a federal government armed with the more fearsome weaponry contained in the Clayton Act and the contemporaneous Federal Trade Commission Act, ch. 311, 38 Stat. 717 (1914) (current version at 15 U.S.C. §§ 41–58), those in the Senate who argued the cause for business and industry attacked as unfairly discriminatory the proposed exception for contempts of orders entered in actions brought by the United States. Senator Borah of Idaho, for example, the primary critic of the exception in the Senate, argued as follows:

**13.** Senator Borah restated this argument later in the debate:

The Senate will observe that the instances in which the party is entitled to a trial by jury are instances in which the acts committed involve a crime. The objection which I had to that was that section 22 excepted from the operation of section 19 all cases in which the Government might be a party plaintiff, and, as the Government would be a party plaintiff in all suits under the trade commission act,

Of course, so far as defendants in a Government case are concerned, all are on the same basis; but under the trade commission all suits will be by the Government and all actions will be against business men. So your discrimination is not as to one class of defendants as against another class of defendants in a Government suit, but the discrimination is as to those who violate injunctions issued at the request of private employers and the Government. The Government is the only party who will bring injunctions under the trade commission, and business men are the only people to whom that law—not in terms, but in its practical workings—will apply. The Government brings a suit, and the trial in contempt cases is by the court. A private party brings a suit, and the trial for contempt cases is by the jury.

51 Cong.Rec. 14371 (remarks of Sen. Borah).[13]

Senator Chilton answered Senator Borah's criticisms in terms strongly reminiscent of Representative Clayton's statement two years earlier:

The distinction is not always clear in every case, but we thought the power of the United States should not be weakened in these trust cases. We wanted teeth in these laws. The Government brings a suit, and we intended to make it effective. There would possibly be so many cases that you could not have trials by juries if the Government should be resisted. We thought possibly people might seek to prolong these trials, and the Government would never get at the end of them.

51 Cong.Rec. 14374 (remarks of Sen. Chilton).

and in a great many cases involving labor disputes as well, that we were practically making no change so far as the great mass of these cases was concerned, and in addition to that we were clearly discriminating against a class of citizens by reason of the fact that the trade commission bill confessedly would operate almost entirely against one class of citizens.

51 Cong.Rec. 14413 (remarks of Sen. Borah).

The arguments of Senator Borah and the response of Senator Chilton suggest that the exception at issue here focuses exclusively on the needs of Government *enforcement* actions. Later, in defense of the bill, Senator Walsh attempted to articulate the grounds for distinguishing between suits brought by private parties and enforcement suits brought by the United States. Denying that there is anything about this that is in the nature of class legislation, 51 Cong. Rec. 14377 (remarks of Sen. Walsh), Senator Walsh specifically addressed the exception for contempts of decrees entered in suits brought by the United States, as follows:

> There is a proper distinction between a suit brought by a private individual or a private corporation for the vindication and establishment of a mere private right and a suit brought by the Government, representing the whole body of the people, to safeguard and protect a public right. Section 22 [embodying the exception] gives expression to that difference, which everybody will recognize.

*Id.*

The ground for distinction suggested by Senator Walsh in the quotation above provides a sound theoretical underpinning for the exception contained in §§ 402 and 3691 entirely consistent with Representative Clayton's statement that the exception was included in order to avoid hindering the Government in the enforcement of the antitrust law. *See supra.* Governmental enforcement actions are vital to the establishment and maintenance of the public interests embodied in federal law. In ways more concrete than law's mere enactment, enforcement actions enable the ultimate realization of the ideals that inspire that law's creation. Central to the effectiveness of a successful enforcement action is the ability to maintain the resulting decree. Of course, federal policy is reflected in the law itself and, thus, is also advanced in actions brought by private parties. Private parties, however, are often motivated in part by private interests. But when the federal government, acting in its sovereign capacity on behalf of all the people, brings an action to enforce a federal law, it has but one purpose: to advance and protect the common good as declared by federal law.

■ Furthermore, it is settled law that, in the ordinary criminal case, a jury verdict of acquittal is final and may not be reversed by the court, either on motion in the trial court or on subsequent appeal when a second trial would be necessitated by the reversal. *See United States v. Scott,* 437 U.S. 82, 91, 98 S.Ct. 2187, 2193, 57 L.Ed.2d 65 (1978). Since "criminal contempt is a crime in the ordinary sense," *Bloom v. Illinois, supra,* 391 U.S. at 201, 88 S.Ct. at 1481, it follows that a jury verdict of acquittal of a person charged with criminal contempt is likewise final, even though that verdict is contrary to the evidence. When this is considered in light of the special importance of decrees obtained in governmental enforcement actions discussed above, there emerges an additional reason why Congress excepted from §§ 402 and 3691 contempts of decrees entered in governmental enforcement actions: a jury verdict of acquittal contrary to evidence indisputably showing a violation of the decree would seriously undermine the value of the original enforcement proceeding.

The foregoing analysis simply demonstrates that, in §§ 402 and 3691, Congress meant what it said. Of course, occasions do arise where an examination of the legislative history compels the conclusion that Congress did not intend what the words of the statute, read literally, might suggest. *See, e. g., Watt v. Alaska,* —— U.S. ——, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981). The Court has, therefore, considered this possibility and addressed it at some length; but nothing in the legislative history of §§ 402 and 3691 convinces the Court that this is such a case.

Even if the Court were to conclude that the legislative history of the exception to §§ 402 and 3691 is ambiguous—and that would seem to be the most favorable reading of this legislative history the Government could possibly hope for—the Court would reach the same result. The plain meaning of the words of the exception is

inescapable: the statutory right to jury trial conferred by §§ 402 and 3691 shall not apply to "contempts committed in disobedience of any . . . order . . . entered in any suit or action *brought or prosecuted* in the name of, or on behalf of, the United States." Had Congress intended the exception to obtain where the order allegedly violated was entered in any suit or action in which the United States was a party, or seeking to advance federally protected rights, it could easily have said just that. To so construe the words "brought or prosecuted," however, is to do more than merely give the words a broad interpretation; it is to ignore completely the words' settled definition. As Chief Justice Marshall said more than a century and a half ago:

> The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words there is no room for construction. The case must be a strong one indeed, which would justify a Court in departing from the plain meaning of words . . . in search of an intention which the words themselves did not suggest.

*United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95–96, 5 L.Ed. 37 (1820). The case of the Government here is not so strong.

There is another reason why interpreting the legislative history of §§ 402 and 3691 as ambiguous should not lead to a different result. As the Supreme Court stated in *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968):

> A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voices of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge.

*Id.* at 155–156, 88 S.Ct. at 1450–1451. Although this was written to explain why the Sixth Amendment's right to trial by jury must have been incorporated in the concept of due process imposed on the states by the Fourteenth Amendment, *see id.* at 158, 88 S.Ct. at 1452, the passage also emphasizes the "deep commitment of the Nation to the right of jury trial." *Id.* at 156, 88 S.Ct. at 1451. That deep commitment is reflected in the decision of Congress to confer a right to trial by jury in §§ 402 and 3691, even in cases where such a right would not be constitutionally mandated. In light of the historically strong interest in trial by jury in criminal cases, that right, once statutorily conferred, should not lightly be withdrawn by broad interpretations of statutory exceptions. Doubts raised by ambiguities in the legislative history should be resolved in favor of the construction conferring the right to a jury trial. In the present case, there is, at best, weak support in the legislative history for a broad construction of the exception to the right conferred by §§ 402 and 3691; therefore, the Court must conclude that the exception cannot be read to deprive the defendants here of the right to trial by jury.

■ With this background, it is clear that the Government neither brought nor prosecuted the action giving rise to the decree allegedly violated by the defendants here. Indeed, the Government, in the person of HUD, was named as a defendant and eventually *held* to have *failed* to meet its affirmative obligation to administer its resources so as to advance federal fair housing objectives. *See Resident Advisory Board v. Rizzo, supra* 425 F.Supp. at 1021. A reading of the findings of fact and conclusions of law in *Resident Advisory Board v. Rizzo, id.* at 987, leads this Court to the conclusion that, although HUD may have given the plaintiffs moral support during the litigation in their efforts to compel the construction of the Whitman project, the litigation was brought and prosecuted

throughout by the plaintiffs alone. *Cf. United States v. Barnett, supra* (Government appointed *amicus curiae* and authorized to seek injunctions and participate in litigation). As the Court sees it, HUD's principal function, both before and after the commencement of the *RAB v. Rizzo* litigation, was merely to administer the distribution of the federal funds under its control in conformity with federal law. The role of a Government agency in overseeing the distribution of federal grants and loans simply cannot be equated with the role of the Government in *directly* enforcing federally protected rights. When wearing its hat as administrator, the Government must be concerned not only with the advancement of federally recognized public interests, but also with the judicious husbanding of scarce resources. There may be times when the Government must resist local public demand in order to reserve its funds for other areas where those funds may be more effectively spent, even though the local demands may be entirely consistent with overall federal policy. This concern, and perhaps others, distinguish the role of the federal government played by HUD in *RAB v. Rizzo* from the role of Government when acting in its traditional enforcement role, such as in antitrust cases. In short, HUD simply was not participating in the *RAB v. Rizzo* litigation in an enforcement capacity, either in form or substance.

**13a.** *But see United States v. Wright,* Cr. No. 80–235M (E.D.Pa. June 18, 1981) (Pollak, J. and Shapiro, J.).

**14.** *Walker v. City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), does not bar these defendants from challenging the validity of the injunction on appeal from the judgments of conviction. In *Walker,* a number of persons and two organizations were enjoined by a state court from engaging in a civil rights demonstration. *Id.* at 308–309, 87 S.Ct. at 1825–1826. Instead of moving to dissolve the injunction and appealing from a denial of such a motion, the persons enjoined proceeded with the demonstration. *Id.* at 310–311, 87 S.Ct. at 1826–1827. Eight of the participants were subsequently found to have violated the injunction and were punished for their contempt by fine and brief imprisonment. *Id.* at 312, 87 S.Ct. at 1827. In the contempt proceedings, the eight participants sought to have the injunction held invalid on the ground that it violated the First

It may be suggested that the Court's decision will impede the swift enforcement of the decree allegedly violated by the defendants. Be that as it may, the Court cannot, in the name of expediency, shirk its responsibility to protect those rights Congress has seen fit to provide.

For all of the above reasons, the Court must conclude that the trial of the defendants without a jury deprived them of their right to a jury trial under 18 U.S.C. §§ 402 and 3691.

### B. *Jury Trial Under 42 U.S.C. § 2000h*

Since the Court has concluded that defendants were entitled to a jury trial under 18 U.S.C. §§ 402 and 3691, the Court has no need to address defendants' contention that they were entitled to a jury trial under 42 U.S.C. § 2000h.[13a]

### IV. *Overbreadth*

In view of the Court's ruling on the jury trial issue, it would ordinarily be premature to address defendants' contention that the injunction they were alleged to have violated was overbroad. However, since the question will most surely be raised again upon remand, the Court believes it should consider this issue now in the interest of expediting the litigation.[14]

Amendment. *Id.* at 311, 87 S.Ct. at 1827. The state courts refused to consider this claim. *Id.* at 311–312, 87 S.Ct. at 1827–1828. On *certiorari,* the Supreme Court affirmed the judgments, holding that the participants should have raised their constitutionally based challenges in a motion to dissolve the injunction and that, having failed to do so, they were now precluded from attacking the contempt judgments on that ground. *Id.* at 315, 87 S.Ct. at 1829.

As the Supreme Court subsequently noted, however, its holding was "based upon the availability of review of those claims at an earlier stage." *United States v. Ryan,* 402 U.S. 530, 532 n.4, 91 S.Ct. 1580, 1582, 29 L.Ed.2d 85 (1971). In the present cases, there is no suggestion that defendants were themselves par-

Defendants focus primarily on the injunction's first paragraph, which defendants contend impermissibly infringes upon protected First Amendment rights. The first paragraph of the injunction provides that the members of the Whitman Council, and those acting in concert with them, are enjoined from engaging in the following activities:

1. Picketing, protesting, rallying, demonstrating or similarly assembling in the Whitman Construction Site Area (that area enclosed by the dotted line on the plan attached hereto) except as follows:

a. At each gate (designated by "X" within the "Whitman Park" area on the attached plan), there may be no more than one informational picket who shall remain in an area outside the passageway as designated by the United States Marshal or his Deputy at the Site. Such informational picket shall not obstruct, block or impede passage to or from the Whitman Construction Site (designated as shaded area marked "Whitman Park" on the attached plan), but may peacefully converse with persons entering or leaving the Whitman Construction Site, provided that such conversation be limited to sixty seconds in duration, and provided that persons who do not wish to stop or converse with the picket may freely pass.

b. All other picketing, demonstrations, rallies, protests, or similar assemblies shall be confined to the barricaded sidewalk area on the east side of Front Street, between Oregon Avenue and Shunk Street, as reflected on the attached plan.[15]

Defendants argue that the injunction "prohibits a wide range of First Amendment protected activity in a substantial portion of the Whitman community." Defendants' Joint Brief, at 30. In particular, defendants note that the injunction prohibits peaceful picketing on private as well as public property, and extends to streets which "obviously would not" be used as access roads to the construction site, as well as streets which would. *Id.* In addition, defendants emphasize that the injunction prohibits all picketing within the area, whether peaceful or not, except in those limited areas specified in subparagraphs (a) and (b) of ¶ 1. *Id.* Thus, defendants argue, the injunction is overbroad and impermissibly infringes on First Amendment rights.

■ While it is plain that "picketing, protesting, rallying, demonstrating, or similarly assemblying" are forms of expression protected by the First Amendment, *see e. g., Police Department of Chicago v. Mosley,* 408 U.S. 92, 97–98, 92 S.Ct. 2286, 2291–2292, 33 L.Ed.2d 212 (1972); *Cox v. Louisiana,* 379 U.S. 536, 552, 555, 85 S.Ct. 453, 463, 464, 13 L.Ed.2d 471 (1965); *Edwards v. South Carolina,* 372 U.S. 229, 235–236, 83 S.Ct. 680, 683–684, 9 L.Ed.2d 697 (1963); *Thornhill v. Alabama,* 310 U.S. 88, 101–106, 60 S.Ct. 736, 743–746, 84 L.Ed. 1093 (1940), it is equally plain that such expression is subject to reasonable "time, place, and manner" regulation where necessary to further significant governmental interests. *E. g. Grayned v. City of Rockford,* 408 U.S. 104, 115, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972); *Cox v. Louisiana, supra,* 379 U.S. at 559, 562–563, 85 S.Ct. at 476, 479–480; *Kovacs v. Cooper,* 336 U.S. 77, 85–86, 69 S.Ct. 448, 452–453, 93 L.Ed. 513 (1949); *Cox v. New Hampshire,* 312 U.S. 569, 576, 61 S.Ct. 762, 765–766, 85 L.Ed. 1049 (1941).

■ After 25 years of planning and 10 years of litigation, the significance of the governmental interest in the speedy completion of the Whitman Park project cannot

---

ties to the *RAB v. Rizzo* litigation, so as to have had a prior opportunity to obtain review of their overbreadth claims. Therefore, the defendants may raise these claims on appeal from their contempt convictions.

15. A copy of the plan referred to in the text of the injunction accompanies this Memorandum as an Appendix.

be gainsaid. Every page of the several opinions handed down in the *RAB v. Rizzo* litigation reflects the strong governmental interest in providing integrated public housing. Picketing, even peaceful picketing, on any of the streets included within the construction site area, as defined by the district court, may hinder construction by preventing access to the site. The fact that a particular street may not *appear* useful as means of access to the site is not controlling; even a minor street may temporarily become essential in the ever-changing circumstances of construction in the heart of a city. Moreover, even though the completion of the Whitman Park project is clearly the polestar of the district court's injunction, the injunction does not prohibit all protest. Indeed, the injunction permits an informational picket to stand at every gate of the site. Each such picket is further permitted to converse with any person entering or leaving the site. Picketing *en masse* is permitted in a large area immediately across the street from one of the two blocks of the project. In view of the strong governmental interest in completing the Whitman project and the long history of interference with its completion, the limitations complained of are neither overbroad nor unreasonable but, to the contrary, are necessary and reasonable regulations governing the time, place and manner by which First Amendment expression may take place.[16]

16. Since the Court has concluded that the injunction is not overbroad, the Court need not decide whether the injunction, although overbroad, is nevertheless valid under overbreadth doctrine stated in *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). In *Broadrick*, the Court stated that, "particularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615, 93 S.Ct. at 2917. *Broadrick's* requirement that the overbreadth "not only be real, but substantial as well," reflects two concerns of the Court: (1) the limitations of language, *id.* at 607–608, 93 S.Ct. at 2913–2914; and, (2) the measure of deference due a legislative enactment, representing the collective judgment of the elected representatives of

## V. Sufficiency of the Evidence

As reflected in its Order of April 21, 1981, the Court did not consider the sufficiency of the evidence in its original disposition of the appeals. After the entry of that Order, however, defendants filed a motion for clarification or reconsideration, urging the Court to determine whether the evidence was sufficient to support each defendant's conviction before the Court remands the cases to the magistrate for trial by a jury. Of course, should the Court, upon such a review, find the evidence presented below insufficient to support the conviction of any one of the defendants, the Court would have to reverse the judgment of conviction as to that defendant and direct the entry of a judgment of acquittal and not merely vacate and remand for a new trial. Since the relief afforded by directing the entry of a judgment of acquittal is thus more complete than that afforded by remanding for a new trial and avoids subjecting the defendant to a new trial, the Court concludes that the proper course would be to consider the sufficiency of the evidence as to each defendant before remanding to the magistrate.

The scope of review in the district court on appeal from a judgment of conviction entered after trial before a magistrate is prescribed by Rule 7 of the Rules of Procedure for the Trial of Misdemeanors Before United States Magistrates:

the people. *Id.* at 613, 93 S.Ct. at 2916 (implicitly recognized in the description of invalidation for overbreadth as "strong medicine"). The concern for the deference due a legislature, however, can have no place where the challenged infringement stems not from a statute but from an injunction. The absence of this concern may thus mean that, where an injunction is challenged, real overbreadth would be sufficient to invalidate the injunction. As stated above, however, the Court need not decide that issue on this appeal. *Cf. Chapman v. Meier*, 420 U.S. 1, 24, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1975) (holding that a court-ordered reapportionment plan shall not be permitted to deviate as much from strict population equality among districts as a legislatively-created reapportionment).

(e) *Scope of Appeal.* The defendant shall not be entitled to a trial *de novo* by a judge of the district court. The scope of appeal shall be the same as on an appeal from a judgment of a district court to a court of appeals.

18 U.S.C., R.Proc. for the Trial of Misdemeanors Before U.S. Magistrates 7(e). *See also United States v. Paramount Moving & Storage Co.,* 479 F.Supp. 959 (M.D.Fla. 1979); *United States v. Davila,* 440 F.Supp. 670, 671–672 (D.P.R.1976).

In determining on appeal whether the evidence presented is sufficient to support the conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Moreover, "[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Id.* (emphasis in original). With these standards in mind, the Court now turns to the evidence presented below.

Briefly, the evidence shows that, on the morning of June 3, 1980, a group of Whitman area residents congregated in front of the gates to the construction site which opened onto Shunk Street, the street separating the two lots of the site. The evidence further shows that the presence of the crowd interfered with access to and egress from the site. At approximately 11:05 a. m. that morning, United States Marshal Edward Schaeffer arrived and, using a bullhorn, made an announcement to the crowd. Marshal Schaeffer began by announcing that he was the United States Marshal, at which point the crowd roared. He continued by stating that the crowd was blocking access to Shunk Street and to the construction site and was, therefore, violating the district court's injunction. He ordered the crowd to disperse and stated that, in five minutes, those who did not leave would be arrested. Some of those in the crowd left. A little more than five minutes later, the police backed a van into the area and began making arrests. The four defendants were among those arrested.

At the trial before the magistrate, the prosecution introduced a chronologically ordered series of photographs taken during the incident. One prosecution witness identified both defendant Whalin and defendant McQuilken in photographs taken shortly before Marshal Schaeffer made his announcement. The witness also identified defendant Pyle in a photograph taken immediately after Marshal Schaeffer made his announcement. All were shown to be in an area within range of Marshal Schaeffer's voice, as amplified by the bullhorn. Although there is evidence that the crowd roared loudly during that portion of Marshal Schaeffer's announcement in which he stated that, by blocking access to the construction site, the crowd was violating the district court's injunction, the Court nevertheless concludes that there is sufficient evidence from which a rational trier of fact could conclude beyond a reasonable doubt that defendants Pyle, McQuilken and Whalin heard the marshal's announcement. Moreover, the Court also concludes that Marshal Schaeffer's announcement provided the defendants with the actual notice of the injunction required to find a person guilty of criminal contempt of that injunction. *See Pettibone v. United States,* 148 U.S. 197, 206–207, 13 S.Ct. 542, 546–547, 37 L.Ed. 419 (1893) (dictum); *Yates v. United States,* 316 F.2d 718, 723 (10th Cir. 1963). Thus, the Court concludes that the evidence is sufficient to support the convictions of defendants Pyle, McQuilken and Whalin.

With respect to defendant Van Blunk, however, the evidence is not sufficient. There is nothing in the record from which a rational trier of fact could conclude beyond

a reasonable doubt that defendant Van Blunk had actual notice of the injunction. In the first place, the first photograph showing defendant Van Blunk at the scene was not taken until near the time of his arrest. Given the ease with which people could move in and out of the crowd that day, it is impossible to infer that, merely because a person was present at the end of the demonstration, he was there throughout. Furthermore, his apparent willingness to submit to arrest, upon which the Government heavily relies, is simply not enough to support an inference that he had violated the injunction with actual knowledge thereof. Certainly it would be peculiar to hold that the mark of an exemplary citizen—quiet submission to arrest in reliance on the justness of the system—should be equated to an admission of guilt. For these reasons, the Court concludes that there is a lack of sufficient evidence to support the conviction of defendant Van Blunk.

VI. *Summary*

By Order of April 21, 1981, the Court rules that, although the magistrate did have subject matter jurisdiction to try these defendants, the defendants were nevertheless denied their statutory right to a jury trial under 18 U.S.C. §§ 402 and 3691. In addition, the Court rules that the injunction allegedly violated was not unconstitutional under the First Amendment. Defendants subsequently filed a motion for clarification or reconsideration asking the Court to consider the sufficiency of the evidence to support the convictions. In response, the Court has considered the sufficiency of the evidence as to each defendant and has concluded that the evidence is sufficient to support the convictions of defendants Pyle, McQuilken and Whalin; but it is not sufficient to support the conviction of defendant Van Blunk. Therefore, the Order vacating the judgments and remanding the cases to the magistrate for a new trial will be modified to include a direction that the conviction of defendant Van Blunk be reversed and a judgment of acquittal entered. An appropriate Order will be entered.

## APPENDIX